THE PRUDENTIAL INSURANCE COMPANY OF AMERICA *v.*
EXECUTIVE ESTATES, INC. AND DOYLE COFER
EXCAVATING & ENGINEERING CO., INC.

[No. 2-1074A256. Filed November 30, 1977. Rehearing denied February 14, 1978.
Transfer denied May 26, 1978.]

*Alan W. Boyd, Thomas M. Scanlon, Barnes, Hickam, Pantzer & Boyd,* of Indianapolis, *Francis M. Hughes, Hughes and Hughes,* of Indianapolis, *Tom R. White, Christian, Waltz, White & Klotz,* of Noblesville, for appellant.

*Robert W. McNevin,* of Indianapolis, *Paul G. Smith,* of Noblesville, for appellees.

## CASE SUMMARY

BUCHANAN, J.—Prudential Insurance Company (Prudential) appeals an Eight Hundred Fifty Thousand ($850,000.00) Dollar judgment in favor of Executive Estates, Inc. (Executive), claiming that as mortgagee it had no duty in disbursing the loan proceeds to protect the interest of the mortgagor (Executive) from liens or encumbrances and that the damages awarded by the jury were excessive.

We affirm in part and reverse in part.

## FACTS

The facts and evidence most favorable to the trial court's judgment are:

Robert McCain (McCain) was an attorney practicing law in Fort Wayne, Indiana, with Harold Korn (Korn).

In late 1965 or early 1966, McCain was contacted at his Fort Wayne law office by his brother-in-law Charles Harvey (Harvey) about investing in a real estate venture. Harvey was an employee in the Production Office of Prudential in Indianapolis.

Harvey related that one Paul Verderosa (Verderosa) had filed a mortgage application with Prudential for funds to be used in acquiring a tract of land near Carmel, Indiana, for residential development. As Verderosa's two co-principals had decided to withdraw from the venture, Harvey asked McCain if he would be interested in taking their place.

Korn then joined the discussions with McCain and Verderosa, and the three formed a corporation — Executive Estates, Inc. — on January 11, 1966, with McCain ultimately becoming President.

To secure funds to acquire the Hamilton County land on which Verderosa held an option to purchase, Executive, with Harvey's assistance, filed a mortgage loan application with Prudential. Executive was granted a first-mortgage loan from Prudential in June of 1966 in the amount of One Hundred Fifty Thousand ($150,000.00) Dollars.

To perform the site work Executive needed additional money and a contractor. As McCain and Korn were not familiar with Indianapolis construction firms, Harvey held an Indianapolis meeting in the early part of August, 1966, and supplied them with several names of local firms, including that of Doyle Cofer (Cofer).

Cofer expressed interest in the project. Another application was then made to Prudential for additional funds to cover site development costs.

On August 3, 1966, D. L. Goggins (Goggins), a mortgage manager for Prudential, wrote Cofer informing him that Goggins

was willing to recommend approval of an additional Two Hundred Thousand ($200,000.00) Dollar loan for this development when the improvements were completed.

Later in August, after Cofer had submitted the lowest bid for site work, Harvey brought Cofer together with McCain and Korn. Subsequently, a no lien contract for the site work was executed on August 29, 1966, with Cofer who promised completion by January of 1967.

Harvey and Goggins conducted a study of the development project and issued a report on November 9, 1966, projecting a gross valuation of Six Hundred Twelve Thousand ($612,000.00) Dollars and recommended a development mortgage loan of Three Hundred Twenty-five Thousand ($325,000.00) Dollars.

This development mortgage loan was ultimately authorized in a letter of January 23, 1967, from Goggins to Executive; however, the amount was subsequently reduced twice: first to Three Hundred Ten Thousand ($310,000.00) Dollars because the lots in Executive Estates would have to be sold without city water, and then to Three Hundred Six Thousand Four Hundred ($306,400.00) Dollars as one lot in the subdivision was being used by Executive for speculative purposes and would not be available for sale.

By January of 1967, despite the site work contract calling for completion by that date, Cofer's work remained unfinished. Also, Executive was not satisfied with the work . . . both problems being brought to Harvey's attention by his frequent visits to the development site.

On March 9, 1967, Goggins wrote a letter to Cofer explaining, among other things, that Prudential would be unable to guarantee payment of Executive's existing indebtedness to Cofer at the time of closing and recommending Cofer either write a letter requesting that Prudential clear the matter with Cofer prior to closing or file some form of lien on the developed tract which would be picked up at the time Executive's mortgage loan funds were finally disbursed.

In August of 1967 McCain and Korn met with Verderosa, Cofer, and Harvey to protest the poor quality of Cofer's workmanship and his failure to meet his deadlines. Cofer in turn promised to finish his work by the end of August or the first of September.

Executive subsequently received several loan commitment extensions from Prudential, the last being to November 28, 1967.

Upon being advised by Cofer in September that he had completed the site work, Executive expressed dissatisfaction with the quality of workmanship. After negotiations extending through September and October, Executive and Cofer orally settled the original contract between them, calling for Two Hundred Two Thousand ($202,000.00) Dollars, for the sum of One Hundred Thirty-five Thousand ($135,000.00) Dollars, Cofer agreeing to "take the lesser amount."

McCain testified that this agreement was not put into writing because Executive was relying on the closing to secure mechanic's lien releases and waivers on separate forms or on the back of the disbursement checks.

A week later Harvey informed McCain and Korn that Cofer had become undecided as to his course of action in accepting this lesser amount; however, Harvey subsequently assured them Cofer had agreed to accept the One Hundred Thirty-five Thousand ($135,000.00) Dollar settlement.

When Harvey advised Executive that he was prepared to set the matter for closing, McCain requested that he (McCain) be paid the money so he could handle the closing personally because Executive did not trust Cofer. Harvey explained that Prudential had its own closing agent and did not use other agents for dispensing money but advised McCain to call Chicago for an official policy statement.

McCain did so and received the same answer from Prudential's legal department. McCain advised Harvey that, as he could not handle the closing personally and dispense the money, he wanted to be present at the closing to make sure it was handled properly.

On the 21st or 22nd of November, 1967, Harvey brought several closing documents to Fort Wayne to be signed by McCain and Korn—a mortgage, a promissory note secured by the mortgage, a closing affidavit, an owner's affidavit, and a guaranty and indemnity agreement, all being instruments designed to protect the mortgagee's interest.

At that time Harvey, McCain, and Korn knew that several mechanic's liens had already been filed by subcontractors. McCain and Korn expressed concern about these liens and the unreleased performance bond with the town of Carmel[1]—all of which were reflected in the documents shown them. Harvey reassured them, however, that any liens or encumbrances "would be taken care of" at the closing and advised them to sign these five documents at this meeting. Upon these assurances, McCain and Korn signed the documents—to be effective November 28, 1967, the date of closing.

On that date McCain went to the closing at the law offices of Barney & Hughes in Indianapolis, that firm being Prudential's agent for disbursing the mortgage funds. Arriving immediately after lunch, McCain gave the receptionist his card and advised her that he was there for the Executive Estates closing.

However, McCain was never seen by Hughes until after the closing was concluded. Harvey was not present at the closing, and apparently Hughes was not informed by either Harvey or Prudential's office that McCain was to be in attendance.

Hughes had received his closing instructions in a transmittal letter from Prudential's Chicago office, dated November 17, 1967. This letter contained no instructions as to securing full releases from all potential lienholders, nor did Harvey instruct Hughes of Executive's problems with Cofer when he delivered the closing documents to Hughes (signed by Executive several days earlier).

In addition to the transmittal letter of instructions and the closing documents, Hughes also received a check for the mortgage

---

1. This bond ran to the town of Carmel to assure proper completion of the site work, and until released lot owners could not obtain building permits. Without a lot owner's ability to secure a building permit the lots were unsalable.

loan proceeds from Prudential, which Executive had yet to indorse.

At the closing, Hughes distributed firm escrow account checks to Cofer's subcontractors for the amount due each of them in exchange for complete releases, and then delivered to Cofer a check for the difference between the amount paid his subcontractors and One Hundred Thirty-five Thousand ($135,00.00) Dollars.

No release was obtained from Cofer. Hughes went over each item with Cofer and received Cofer's oral acknowledgment that the One Hundred Thirty-five Thousand ($135,000.00) Dollars was the full gross sum due him.

Following the closing (McCain had been waiting approximately thirty to forty-five minutes), Hughes appeared, introduced himself, informed McCain that the mortgage money had been disbursed, and handed him a copy of the note and mortgage.

McCain testified he had "no reason to believe it [his exclusion from the closing] was an intended act."

Learning that the performance bond with Carmel had not been released, McCain informed Hughes he would not approve disbursement of the loan proceeds until this release was obtained.[2]

Later that day Harvey requested McCain return to Hughes' office, assuring him the closing problems would be solved. It was then McCain learned a release had not been obtained from Cofer.

Because of McCain's objections to the closing, Hughes offered to stop payment on the disbursement checks — which later proved impractical as some contractors had already cashed their checks and Cofer immediately had his check certified.

Assured that payment would be stopped on the checks and releases obtained from Cofer and from the town of Carmel, McCain endorsed Executive's check from Prudential so the funds could go into Hughes' escrow account.

---

2. See note 1 *supra.*

The next morning McCain accompanied Harvey to a meeting with Homer Gradle — Carmel's Building Commissioner. Gradle informed them the streets in Executive Estates had not been constructed in a workmanlike manner and would not be accepted by Carmel, which meant the performance bond would not be released.

Further assurances followed from Harvey that Prudential would get the performance bond released.

Finally, near the end of December, Hughes, as Prudential's escrow agent, signed an escrow agreement with Carmel under which Cofer deposited Six Thousand ($6,000.00) Dollars to assure satisfactory completion of Executive Estates . . . and the performance bond was ultimately released.

Then in mid-January, 1968, McCain and Korn received notice that Cofer had filed a Sixty-seven Thousand ($67,000.00) Dollar mechanic's lien in Hamilton County, dated January 12, 1968, and recorded January 15, 1968.

A year later, January 8, 1969, Cofer filed suit in Hamilton County against Executive in two paragraphs: the first being on his mechanic's lien and the second on a theory of quantum meruit. Executive counterclaimed that there had been a no lien contract and Cofer had breached that contract by filing a mechanic's lien.

On December 16, 1969, Korn gave written notice to Goggins that Executive did not intend to make the December interest payment on the mortgage loan because lots were unsalable due to the failure of Prudential to secure a full release from Cofer and release of the performance bond.[3]

Although the site work remained incomplete at the time Cofer's suit was set for trial, Cofer obtained a judgment of Forty Thousand ($40,000.00) Dollars on April 15, 1970, on a quantum meruit theory.

Ultimately Prudential filed this action against Executive Estates on July 17, 1970, in Hamilton County, to foreclose its

3. Korn died shortly thereafter, his estate becoming a party in interest in this suit.

mortgage. Executive counterclaimed on September 17, 1970, for damages attributable to Prudential's handling of the closing.

On May 25, 1971, Prudential was granted summary judgment in the sum of Three Hundred Seventy-five Thousand Six Hundred Six and 44/100 ($375,606.44) Dollars representing principal, accumulated interest, and taxes on the mortgage; costs; and attorney's fees.

Trial was held on Executive's counterclaim approximately three years later. McCain's testimony detailed the entire mortgage transaction: His recitation of damages, over objection, was the primary source of evidence on this issue, and is more fully set out in ISSUE TWO. On March 19, 1974, the jury favored Executive with a verdict of Eight Hundred Fifty Thousand ($850,000.00) Dollars against Prudential ... the jury memorandum sheet indicating an award of actual damages in the amount of Four Hundred Seventy-five Thousand ($475,000.00) Dollars and punitive damages of Three Hundred Seventy-five Thousand ($375,000.00) Dollars.

Prudential now appeals the judgment on Executive's counterclaim.

## ISSUES

We consolidate the issues as follows:

ISSUE ONE: Did Prudential (as mortgagee) negligently fail to protect Executive's interest (as mortgagor) in disbursing the loan proceeds?

ISSUE TWO: Were compensatory and punitive damages properly awarded?

The contentions of each party are treated with the resolution of each issue below.

## DECISION

### Issue One — Liability

PARTIES' CONTENTIONS — Prudential contends that it owed

no legal duty to Executive to obtain complete releases[4] from third parties or to secure release of the performance bond with Carmel, absent an agreement to do so, and that there was no evidence of any such agreement. Prudential adds that even if such duty were owed to Executive, it was not breached.

Executive counters that under these facts such a duty was imposed upon Prudential as the mortgagee by the relationship of the parties involved and the customs prevailing in Indianapolis at the time of the closing—and that duty was breached.

CONCLUSION—It is our opinion that Prudential had a duty, and breached it, to disburse the loan proceeds so as to protect the interest of Executive by securing releases from those having claims against Executive.[5] As will hereinafter appear, the duty so imposed arose by an express agreement of the parties, by the custom and practice prevailing in Indianapolis at the time of the Executive Estates closing, and by special relationship of the parties.

Executive's burden in seeking to hold Prudential liable was succinctly defined by the Louisiana Court of Appeals in *Bollinger v. Livingston State Bank and Trust Co.* (La.App. 1966), 187 So.2d 784, 786:[6]

It is elementary that in order to recover damages in this case plaintiff bears the burden of pointing out a contractual or fiduciary duty on the part of the defendant, of proving a breach

4. We, as do the parties, use "release" in the sense of a complete release, including not only release of existing liens of record but also waiver of the right to file future liens.

5. Our conclusion disposes of the liability issue which Prudential posited in several ways: that the trial court erred in overruling its TR. 12(B)(6) motion to Executive's counterclaim, that the trial court erred in overruling its motion for judgment at the conclusion of all the evidence, that there was insufficient evidence to support the verdict as to Prudential's legal duty to Executive to obtain a release or waiver from Cofer, that the verdict was contrary to law in that Prudential had no legal duty to obtain such release of waiver, absent an agreement to do so (and that there was none).

6. *Bollinger* dealt with an action by a mortgagor against a mortgagee (who had agreed to make progress payments and supervise construction) for expenses incurred when the mortgagor had to pay subcontractors after the mortgagee disbursed mortgage proceeds to contractors without determining that the subcontractors had been paid.

of that duty, of showing that the breach of duty complained of was a proximate cause of the injury, and that the injury actually was suffered and is compensable.

The law is sparse, none in Indiana, as to the duty of a mortgagee to protect the interest of the mortgagor in disbursing loan proceeds. Our reading convinces us that the mortgagee cannot act in total disregard of the mortgagor's interest.

As a general rule, "a mortgagee is not required to protect the interests of the mortgagor unless an agreement requires him to do so." 59 C.J.S. *Mortgages* § 298, at 370 (1949) (footnotes omitted).

But the mortgagee must place the mortgage proceeds in the hands of the mortgagor, or at least see they are applied in accordance with the mortgagor's intentions:

Where the consideration for a mortgage is a loan by the mortgagee to the mortgagor, the rule is that in the absence of some other arrangement between the parties to the mortgage, the amount of the loan must actually come into the hands of the mortgagor or his agent in order to fix the rights and liabilities of the parties, although it is, of course, sufficient if the money is paid into the hands of his agent for his use. The mortgagee is required to pay over the whole consideration, not being permitted to retain any part of it for the purpose of applying it on other debts or obligations, although he may, by agreement, retain part of the amount which he has agreed to advance until certain conditions have been fulfilled, or he may, by agreement, use part of it in paying off an encumbrance or other debts, and the mortgagor may direct or acquiesce in the disbursement of the proceeds of the loan by the mortgagee. 59 C.J.S. *Mortgages* § 297, at 369-70 (1949) (footnotes omitted).

If the mortgagor is denied actual possession of the mortgage proceeds, it would appear the mortgagee has kept them to disburse himself under a special agreement, or has placed himself in a position of trust in the absence of an agreement. If the mortgagee keeps the proceeds and "agrees to apply the proceeds for a certain purpose he is liable for a failure to do so." 59 C.J.S. *Mortgage* § 297, at 370 (1949) (footnote omitted).

The evidence indicates that Prudential denied Executive, as it did all mortgagors as a matter of policy, the right to personally control the disbursement of the mortgage proceeds. So it is pertinent to ascertain the nature and scope of the duty assumed by Prudential in disbursing Executive's loan proceeds.

### Duty of Mortgagee to Protect Interest of Mortgagor by Specific Agreement

Considering the evidence most favorable to Executive, the conclusion is irresistible that the jury could reasonably have found Prudential owed a duty to Executive arising out of an express agreement to secure a complete release from Cofer and to secure release of the performance bond with Carmel before disbursing the loan proceeds.

When Harvey brought the closing documents to Fort Wayne for McCain's and Korn's signatures, McCain expressed concern about the closing and elicited a promise from Harvey that Prudential would adequately protect Executive's interest at the closing.[7] Harvey flatly promised McCain "there would be no liens

---

7.  Q.  Now, Mr. McCain, to the best of your knowledge at the time that those documents were signed in Fort Wayne by you and Judge Korn, had there been any liens filed against the project?

    A.  Yes, there had been. We talked about those with Mr. Harvey when he was there in our office.

    Q.  Will you relate that conversation to us?

    A.  We had a conversation with Harvey in our office at that time, the Prudential agent, and Judge Korn, and myself, at which time of course they well knew as we did that there had already been some liens filed by some contractors on the project. And we advised that we were worried about those liens being on the real estate in connection with examination of one of these documents, and also that a performance bond had not been released. We were advised this would be taken care of and handled at the time of the closing there.

    Q.  Who advised you of this?

    A.  Mr. Harvey.

    Q.  Did you have any other conversations about the liens at that time? I'm speaking about the time that the documents were signed, 14, 15, 16 and 17.

    A.  Well, the Prudential agent, Mr. Harvey, advised us to proceed to sign these documents on the 21st or 22nd of November, a week before the closing, because at the time of the closing then there would be no liens or encumbrances on that real estate because Prudential would take care of it.

Record at 435-36.

or encumbrances on that real estate because Prudential would take care of it." That this language meant complete releases would be obtained by Prudential is supported not only by the context in which it was made, but also by other testimony as to the custom and practice surrounding real estate closings in Indianapolis at that time.[8]

Courts have long required the mortgagee to honor a duty self-imposed by his agreement with the mortgagor to protect the mortgagor's interest in the mortgaged real estate.

In *Page v. Franklin* (1913), 214 Mass. 552, 101 N.E. 1084, the plaintiff executed a real estate mortgage to the defendant, as trustee, in consideration for the defendant's agreement to pay prior notes and mortgages. When the defendant neglected to pay these mortgages and a prior mortgagee foreclosed, the plaintiff sued the defendant to cancel his mortgage and for other damages suffered. The Massachusetts Supreme Court observed:

> Indeed it would be anomalous, if after losing her estate through the defendant's contractual breach, as well as by abuse of his trust, the plaintiff also must pay the amount of the mortgage note as a gratuity. *Page v. Franklin, supra* at 556-57, 101 N.E. at 1085 (citations omitted).

And in *Speights v. Arkansas Savings and Loan Association* (1965), 239 Ark. 587, 589, 393 S.W.2d 228, 230 (reh. denied Sept. 20, 1965), when the lending institution agreed to act as the mortgagor's "agents and make final disbursement of the said loan proceeds in accordance with the terms as agreed upon by us this date," received orders not to pay the contractor until all bills of the subcontractors were satisfied, but paid the contractor regardless and left unsatisfied subcontractors, the court concluded that "any loss resulting from this unfortunate adventure must

---

8. As so long acknowledged:

While it is true that usage cannot control an express contract, yet where a contract is ambiguous, the presumption is that it was made with reference to the known usage or general course of the particular business. In such case the question becomes one of fact to be determined as any other question of fact. *Leiter v. Emmons* (1898), 20 Ind. App. 22, 25, 50 N.E. 40, 41.

fall on [the lending institution] and not on [the mortgagors]."[9]

Just as the defendant's promise to pay prior mortgages went to the heart of the consideration for the mortgage given by the injured mortgagor in *Page*, as did the bank's agreement in *Speights*, the promise made by Harvey for Prudential to protect the interest of Executive at the closing goes to the heart of the consideration for the mortgage here also. Harvey's promise was made to procure Executive's signature on documents which would make the entire mortgage transaction possible and give Prudential a first lien on the developed real estate.

So Prudential's duty as mortgagee (self-imposed by specific, express agreement), to protect the interest of Executive as mortgagor provided the basis for an actionable claim.[10] *See Speights v. Arkansas Sav. & Loan Ass'n, supra; Bollinger v. Livingston State Bank & Trust Co., supra; Page v. Franklin, supra; Prater v. Fidelity Trust Co.* (1930), 161 Tenn. 626, 34 S.W.2d 205 (agreement to pay-off, take up, and cancel outstanding mortgage note); *see also Goodner v. Lawson* (1950), 33 Tenn. App. 676, 232 S.W.2d 587 (cert. denied by Tennessee Supreme Court).

Our finding of a duty arising from an express agreement hardly revolutionizes Indiana law. Prudential simply agreed to become Executive's agent to protect the interests of its principal. Agents are bound to exercise reasonable care and skill to protect the principal's property. *Bechtold v. Lyon* (1892), 130 Ind. 194, 29 N.E. 912; *Welsh v. Brown* (1893), 8 Ind. App. 421, 35 N.E. 921. This the agent failed to do in violation of an express agreement.

### Duty of Mortgagee to Protect Interest of Mortgagor by Custom and Practice

There is another basis for finding a duty in Prudential to protect Executive's interest in the mortgaged real estate — custom

9.  *Speights, supra* at 590, 393 S.W.2d at 230 (the contractor abandoned the project after receiving his funds and the mortgagors were subjected to liens of subcontractors).

10.  The oral agreement would appear to be valid because it was to be performed within one year (promise made November 22, 1967; closing November 28, 1967). *See* IND. CODE § 32-2-1-1.

and practice prevailing in the Indianapolis real estate community on November 28, 1967.

The deposition of Thomas P. Pendergast, a resident attorney at Prudential's Illinois-Indiana Mortgage Loan Department in Chicago, indicated a study was conducted by Harvey following the ill fated closing. This study revealed that all Indianapolis mortgagees polled obtained some form of lien protection for mortgagors at closings.

Additionally, James E. Dowling, an Indianapolis attorney practicing principally in the fields of business and real estate, detailed the custom and practice surrounding real estate closings and mortgage money disbursements in Marion County on November 28, 1967. He stated that in subdivision developments (as here), lending institutions protected their borrowers' interests by securing releases of any existing liens and waivers of liens not filed by the time of the closing.[11]

Also there was evidence that Executive was relying on this custom for resolution of its problems with Cofer . . . and Prudential was aware of this custom and Executive's reliance thereon.[12]

Consequently, the jury could reasonably have concluded that custom and practice prevailing in the Indianapolis mortgage real estate community required Prudential obtain complete releases from recipients of the loan proceeds (including Cofer).

That legal duties may arise and be imposed by custom and practice is a long established proposition:

---

11.   A stamp is often used on the reverse side of the checks given to contractors and materialmen:

Endorsement hereon by Payee acknowledges payment in full of all claims for labor and material furnished or used by Payee to _____, 19__ in construction of _____ at _____ _____ and Payee waives all rights to a mechanic's lien for such labor and materials to said date.

Record at 716A.

12.   Pendergast's deposition noted a memo he made after talking with Harvey (Harvey then had acquired all the closing documents from Executive), in which Pendergast was aware of the amount due Cofer ($135,000.00) and that a lien waiver should be obtained by Prudential from Cofer at the closing.

Where a usage in a particular trade or business is known, uniform, reasonable, and not contrary to law, or opposed to public policy, evidence of such usage may be considered in ascertaining the otherwise uncertain meaning of a contract, unless the proof of such usage contradicts the express terms of the agreement. This is so even though the usage be that of a particular person, provided it be known to the parties concerned, or provided it has been so long continued, or has become so generally known and notorious in the place or neighborhood, as to justify the presumption that it must have been known to the parties.

Parties who are engaged in a particular trade or business, or persons accustomed to deal with those engaged in a particular business, may be presumed to have knowledge of the uniform course of such business. Its usages may, therefore, in the absence of an agreement to the contrary, reasonably be supposed to have entered into and formed part of their contracts and understandings in relation to such business, as ordinary incidents thereto. *Morningstar v. Cunningham* (1887), 110 Ind. 328, 334-35, 11 N.E. 593, 596 (citations omitted).[13]

### Duty of Mortgagee To Protect Interest of Mortgagor Because of the Relationship of the Parties

The mere relationship of mortgagor-mortgagee may require the mortgagee to protect the mortgagor's interest at a closing in which the mortgagee controls disposition of the loan proceeds. The few cases treating this subject deal mostly with "construction mortgages," a construction mortgage being defined as "one obtained for the purpose of financing construction, under which the mortgagee is empowered and obligated to disburse the funds to the builder or contractor as the construction progresses." 55 Am.Jur.2d *Mortgages* § 14, at 203 (1971).

Although all funds were disbursed here by Prudential at one time, distinguishing it from the classic "construction mortgage," there is little real meaning in such a distinction.[14]

---

13. *See also, e.g., Wright Mfg. Corp. v. Scott* (1977), 172 Ind. App. 154, 360 N.E.2d 2; *Cole v. Leach* (1911), 47 Ind. App. 341, 94 N.E. 577.

14. The mortgage before us is somewhat of a hybrid. Part of the funds disbursed at the closing, One Hundred Fifty-three Thousand Nine Hundred ($153,000.00) Dollars went back to Prudential as principal and interest to retire the first mortgage extended Executive for acquisition of the bare land. Thus, a portion of the disbursed funds went to retire an earlier "purchase-money mortgage." The bulk of the remaining Three Hundred Six Thousand Four Hundred ($306,400.00) Dollars

Prudential was intimately involved in every aspect of the lending process much the same as it would be were it making a "construction mortgage."

The generally recognized rule is that "a construction mortgage may have distinctive features in that the mortgagee may become liable in tort to the mortgagor if reasonable care is not exercised in disbursing the funds to protect the mortgagor from mechanics' liens filed against the property...." 55 AMJUR.2d *Mortgages* § 14, at 203 (1971).

The relationship of the lending institution-mortgagee and the borrower-mortgagor under these circumstances combine with principles of equity and agency law to require the mortgagee to obtain releases for protection of the mortgagor.

The *Bollinger* court said it this way:

> *The duty which the bank owed to plaintiff was that of a fiduciary and agent, for this is the nature of the relationship created between them.*

> Certainly such a duty contemplates an exercise of the highest standards of honesty, integrity and performance but with reference to what activity on the part of the fiduciary? The answer to that poses the real difficulty in this case. Certainly the proper discharge of some activities is required of the bank as a matter of law. Other undertakings would be imposed on the bank by virtue of an agreement, either actual or implied, between itself and the plaintiff. Still others might be undertaken voluntarily for its own protection or for the protection and/or accommodation of the plaintiff. In all of these various types of activities or undertakings the bank owes plaintiff the highest standards of honesty, fair dealing and performance. *Bollinger v. Livingston State Bank & Trust Co., supra* at 787 (emphasis added).[15]

disbursed at the closing went to contractors as reimbursement for development of the bare land in Executive Estates.

In this case, as with a "construction mortgage," the mortgage proceeds were disbursed by the mortgagee after close involvement in the construction process and a promise to clear title of bonds and liens before disbursement.

15. Despite finding a duty, the *Bollinger* court found no breach or proximate cause in reviewing the mortgagor's *negative* judgment.

The Ohio Court of Appeals likewise found a duty in the mortgagee to protect the interests of the mortgagor in disbursing construction money. In *Falls Lumber Company v. Heman* (1961), 114 Ohio App. 262, 264-66, 181 N.E.2d 713, 715-16, the court said:

> The [lender-mortgagee] is an institution established, among other things, for the purpose of making loans on improved real estate and, as such, holds itself out to the community as skilled in conducting all phases of such transactions. This Bank surely knew the necessary procedure to preclude the establishment of mechanics' liens upon the house being constructed herein. . . .
>
> * * *
>
> It must be noted herein that the Bank was not performing its services gratuitously. It had been paid for the construction loan the standard fee. . . .
>
> * * *
>
> We therefore conclude that, when the Bank undertook to disburse money for [the mortgagors] for the construction of the home being built for them by the [contractors], *it was required to use reasonable care to see that mechanics and materialmen were paid* by the contractor, *and to* that end it was obliged to *use ordinary care to protect [the mortgagors] from having mechanics' liens placed against their home.* (emphasis supplied)[16]

---

The court's comments on duty were subsequently viewed restrictively, however, in a federal decision:

> It is well settled that, under Louisiana law, a lender of funds on a construction project has no liability to any party for cost overruns or diversion of funds by the contractor in the absence of a fiduciary relationship between the lender and the injured party. *Ross v. Continental Mortgage Investors* (E.D. La. 1975), 404 F. Supp. 922, 925 (citing among others *Bollinger*).

16. While the *Falls* decision involved a statute imposing a duty on the lending institution to protect the borrower from mechanic's liens, the basic analysis of the relationship of the parties in *Falls* is close to the facts here and defines a general duty owed. The bank's agreement in *Falls* "to take care of things" for the borrowers compares with Harvey's promise to "take care of it."

As far as the statute is concerned in *Falls*, the decision is not based on the existence of the statute itself. Instead, duty is imposed by the fact that the lending institution held "itself out to the community as skilled in conducting all phases of such transactions . . . [and] *surely knew the necessary procedure to preclude the establishment of mechanic's liens* [as set out by the statute]." 114 Ohio App. at 264-65, 181 N.E.2d at 715 (emphasis added).

There is a cogent analysis of the mortgage transaction in Justice Celebrezze's dissent in *Gardner Plumbing, Inc. v. Cottrill* (1975), 44 Ohio St.2d 111, 117, 338 N.E.2d 757, 760-61:[17]

> It would appear that the "Construction Fee" was paid to the bank for the purpose of representing the borrowers' interests, when disbursing the loaned funds. Dollar Federal was in the business of making construction loans and was theoretically skilled, as well as schooled, in the procedure and had an obligation to use its expertise in protecting the Cottrills' interests. *It is impossible for this writer to conceive of the relationship between Cottrills and Dollar Federal as other than that of principal to agent.* (emphasis supplied)

It is likewise difficult for us to conceive of the relationship between Prudential and Executive at the time of closing as anything other than principal and agent.

Some authorities do not impose on the lender-mortgagee a duty to protect the mortgagor. For example, Tennessee has taken a restrictive approach:

> [W]e think the Association was duty-bound to see to the payment of materialmen's liens only to the extent it assumed that duty by contract with its borrowers. It is not of controlling importance that the borrowers relied upon the Association to perform that function. They may have assumed that it would investigate for liens to protect its own interest and the prevailing custom, as shown by the proof, would seem to warrant that conclusion on the part of the borrowers. This is not enough, however, in the absence of contract to impose liability upon the Association. *Goodner v. Lawson* (1950), 33 Tenn. App. 676, 683, 232 S.W.2d 587, 590 (cert. denied by Tennessee Supreme Court).

Such cases are not persuasive. A mortgagee-lender who insists on controllilng disbursement of the loan proceeds in order to protect its own interests (mortgage lien), deprives the mortgagor of possession of the loan proceeds for which he has bargained, and in doing so must equitably be considered as the mortgagor's agent saddled with a duty to use

---

17. In reviewing a *negative judgment* the majority refused to reweigh the evidence and find an agency relationship on the facts in view of conflicting evidence.

reasonable care to protect the principal's interests. 55 AM. JUR. 2d *Mortgages* § 14 at 203 (1971); *Falls Lumber Co. v. Heman, supra. See also Bulla v. Donahue* (1977), 174 Ind. App. 123, 366 N.E.2d 233; *Montgomery Ward & Co., Inc. v. Tackett* (1975), 163 Ind. App. 211, 323 N.E.2d 242.

Imposing liability on an agency basis is a vintage Indiana case, *Welsh v. Brown* (1893), 8 Ind. App. 421, 424, 35 N.E. 921, 922:

> [T]he decedent [principal] directed the appellee, as his agent, to loan the money, when said Albert Brown secured him with a mortgage upon eighty acres of ground, which he owned, said land to be unincumbered. If the appellee disregarded his instructions and loaned the money with a pre-existing mortgage still on the land, he was liable to decedent therefor, if loss resulted therefrom. . . .

Thus, whether we rely on (a) an express agreement; (b) custom and practice; or (c) principal-agent relationship, Prudential was under a duty to secure releases from Cofer and the Town of Carmel.

### Breach of Duty of Mortgagee to Protect Interest of Mortgagor

As was said in *Falls Lumber Co. v. Heman, supra* at 265, 181 N.E.2d at 716:

> It certainly is reasonable to conclude that one who undertakes to act for another in the disbursing of funds is answerable for failure to do so with due care.

The evidence viewed most favorably to Executive as appellee reveals a breach of Prudential's duty to use reasonable care in disbursing the loan proceeds.

At the closing of November 28, 1967, controlled by Prudential and from which McCain was excluded, all the loan proceeds were disbursed without releases being first secured from Cofer, the general contractor, and the Town of Carmel, who held a performance bond covering land improvements. Prudential's closing agent was not informed by Harvey that McCain was to be present or of the problems with Cofer and the Carmel bond. Thus,

through Prudential's lack of diligence in coordinating its corporate activity, creditors of Executive received their funds, Prudential acquired a first mortgage on Executive Estates, and Executive was left with real estate clouded by an unreleased performance bond and possible future claims of third parties.

The evidence most favorable to Executive additionally reveals that from these breaches of duty flowed the complications which proximately caused Executive's loss.

Cofer, being bound only by an informal acknowledgement of the monies owed him, immediately certified his check and filed a mechanic's lien on the real estate in Executive Estates. This lien, and Cofer's subsequent judgment, cast a cloud upon Executive's title to the developed real estate and consequently destroyed its marketability.[18]

The improved lots in Executive Estates were not marketable for another reason attributable to Prudential. Although Harvey had specifically promised to take the necessary steps to see that the performance bond with Carmel was released before Prudential held the closing, the closing was consummated with the performance bond unreleased.

This meant the subdivision was not satisfactory for acceptance into the city system and building permits would not be issued.

So the jury could reasonably have concluded there would have been a market for Executive's lots had it not been for Prudential's breach of duty which permitted Cofer to cloud Executive's title, even though the work was improperly done as evidenced by the unreleased performance bond.

Issue Two — Damages

ADDITIONAL FACTS — McCain's enumeration of items he considered Executive's damages was the major source of evidence

---

18. On March 5, and on May 22, 1968, Sweeney secured purchase agreements from interested buyers for four lots — representing a total sale price of Twenty-Four Thousand Five Hundred ($24,500.00) Dollars — and for six lots in the amount of Twenty-seven Thousand Six Hundred ($27,600.00) Dollars. These sales were never consummated, however, because the title binders showed a flaw in Executive's title — Cofer's mechanic's lien.

available to the jury:

Judgment held by Prudential
   against Executive Estate,
   $375,606.44, minus the
   mortgage of $306,400.00,
   leaving a deficit equaling ................... $ 69,206.44

Interest on that entire
   judgment over a three year
   period ............................... $ 78,877.35

Interest to Prudential on
   original ($150,000.00)
   mortgage ............................. $ 13,650.00

Interest to Prudential on
   the second ($306,500.00)
   mortgage ............................. $ 45,822.00

Interest still claimed on
   that second mortgage ..................... $ 29,246.00

Loan principal at Union
   State Bank ............................ $ 20,000.00

Note principal at Lincoln
   Nat'l Bank & Trust Co.,
   Fort Wayne ........................... $ 50,000.00

Judgment for Cofer rendered
   April of 1970 .......................... $ 40,000.00

Interest on that judgment
   from April, 1970 at 6% ................... $ 10,000.00

Real Estate Taxes on
   Executive Estates from
   date of purchase to
   May, 1969 ............................ $ 45,784.47

Balance due on an engineering
   bill from Midstates Engineer-
   ing Co. of Indianapolis ...................... $ 6,000.00

Accountant's fee .......................... $ 500.00

Fee paid to a land surveyor       $ 50.00

Fee owed to James Sweeney .................. $ 5,500.00

Attorney's fees owed to
McNiven, not including
this case ............................... $ 14,000.00
                          Sub-total ...................... $428,636.26[19]

Plus anticipated profits  ..................... $200,000.00
              TOTAL                         $628,636.26

Executive's marketing agent (Sweeney) did testify as to offers of purchase for various developed lots . . . all representing *gross* sale figures. One offer established a gross sale price of Six Thousand One Hundred Twenty-five ($6,125.00) Dollars per lot and another of Four Thousand Six Hundred ($4,600.00) Dollars per lot.

Executive's counterclaim alleged negligence, but did not allege fraud.

From this evidence the jury arrived at an Eight Hundred Fifty Thousand ($850,000.00) Dollar verdict in favor of Executive against Prudential. An accompanying memorandum indicated a division — actual damages of Four Hundred Seventy-five Thousand ($475,000.00) Dollars; punitive damages of Three Hundred Seventy-five Thousand ($375,000.00) Dollars.

PARTIES' CONTENTIONS — Prudential predicates error on the damages as awarded, in summary claiming there was no basis in the evidence for an award of punitive damages, which was excessive, and an improper measure of damages was the basis of the award of compensatory damages. Executive contends that the damages as awarded were proper under the law and within the scope of the evidence.

### Punitive Damages

CONCLUSION — There is no basis in law or fact to support an award of punitive damages.[20]

---

19.  The parties used a figure of Four Hundred Fourteen Thousand Six Hundred Thirty-Six and 26/100 ($414,636.26) Dollars. Our computation indicates the above sub-total.

20.  Our conclusion eliminates the need to discuss other alleged errors concerning punitive damages.

There is no evidence in the record to support an award of punitive damages as the law stands today. As previously indicated the evidence most favorable to the judgment results at best in liability based on negligence. Thus Final Instruction No. 15 is erroneous:

> If you find from the evidence that the wrongful acts of Prudential, if any, as complained of by Executive Estates, were committed in a *willful, or wanton disregard of the rights of Executive Estates,* you may consider an addition to compensatory damages, exemplary damages. Exemplary damages are those damages which may be awarded so as to be a warning to, or deter Prudential and others from continuing to engage in such wrongful acts. (emphasis added)

An award of punitive damages for mere negligence is improper. *See, e.g., Louisville, N.A. & C. Ry. v. Shanks* (1884), 94 Ind. 598; *Sinclair Refining Co. v. McCullom* (1940), 107 Ind. App. 356, 24 N.E.2d 784. *But see Wheatcraft v. Myers* (1914), 57 Ind. App. 371, 107 N.E. 81 (punitive damages assessable because disregard of facts ascertainable by use of due care construed to amount to fraudulent intent). Rather the conduct supporting punitive damages must be of a more reprehensible character, e.g., malice, gross fraud, oppressive conduct, or heedless disregard of the consequences. *Lou Leventhal Auto Co., Inc. v. Munns* (1975), 164 Ind. App. 368, 328 N.E.2d 734; *True Temper Corp. v. Moore* (1973), 157 Ind. App. 142, 299 N.E.2d 844; *Alderman Ford Sales, Inc. v. Bailey* (1972), 154 Ind. App. 632, 291 N.E.2d 92; *Jones v. Hernandez* (1970), 148 Ind. App. 17, 263 N.E.2d 759.

Eliminating malice, gross fraud, and oppressive conduct as unsupported by the evidence, we examine what has been characterized as "heedless or reckless disregard of consequences" to ascertain if such conduct could justify imposition of punitive damages.

Prior Indiana case law sustaining punitive damages and characterizing the egregious conduct as heedless or reckless disregard of consequences, have dealt with more direct and deliberate behavior than that exhibited by Prudential.

That a heedless or reckless disregard of consequences will support punitive damages is recognized in principle more than actuality . . . the phrase being enumerated along with other descriptive terms in cases dealing with more oppressive behavior of the wrongdoer. *See, e.g., Nicholson's Mobile Home Sales, Inc. v. Schramm* (1975), 164 Ind. App. 598, 330 N.E.2d 785; *Lou Leventhal Auto Co., Inc. v. Munns, supra.*

The phrase also appears to be used as an alternative to the description of more oppressive conduct. *Harness v. Steele* (1902), 159 Ind. 286, 64 N.E. 875; *Citizens' Street R.R. v. Willoeby* (1893), 134 Ind. 563, 33 N.E. 627.[21]

When specific conduct has been characterized as a heedless or reckless disregard of consequences, the conduct would appear to be more accurately characterized as a conscious and intentional wrongdoing better described by such words as oppression or malice. In *Bob Anderson Pontiac, Inc. v. Davidson* (1973), 155 Ind. App. 395, 400, 293 N.E.2d 232, 235, the facts centered on consumer fraud (altered automobile odometer and misrepresented condition) which the court also characterized as a "negligent or willful misrepresentation of a material fact inducing the entry into a contract." *Capital Dodge, Inc. v. Haley* (1972), 154 Ind. App. 1, 288 N.E.2d 766 likewise dealt with consumer fraud—inducing a sale by promising non-existent insurance coverage.

In two cases in which the court spoke *only* of a heedless disregard of consequences, a more conscious and direct type of behavior was nevertheless included. The wrongdoer in *True Temper Corp. v. Moore* (1973), 157 Ind. App. 142, 299 N.E.2d 844, bought and cut standing timber from a seller known not to own the land. The wrongdoer's conduct in *Jones v. Hernandez* (1970), 148 Ind. App. 17, 263 N.E.2d 759, was just as direct and conscious . . . charging an electric fence with 110 volts to keep neighboring farm laborers away.

---

21. In *Harness v. Steele*, the court dealt with false imprisonment and a "sweating process" to extort a confession "willfully done in a wanton or oppressive manner." 159 Ind. at 299-300, 64 N.E. at 880. And in *Citizens' Street R.R. v. Willoeby*, the wrongful ejectment of a passenger from a moving train was done "in a spirit of oppressive malice," 134 Ind. at 569, 33 N.E. at 629, and with a heedless disregard of consequences.

So it seems reasonable to conclude that something more than a state of mind described as heedless disregard of the consequences is required to justify imposition of punitive damages. The cases seem to have dealt with a state of mind demonstrating actual malice or a wontonness from which the law could imply malice.[22] None in Indiana have yet gone so far as to support or award punitive damages solely on the basis of a concept of heedless disregard of the consequences, which might also be described as constructive malice.

Prudential's conduct, measured by any of these standards, falls short of constituting an independent tort of such a reprehensible nature as to justify imposition of punitive damages.

McCain testified that he believed he was not purposely excluded from the closing. Other evidence reveals only a breakdown in the channels of communication of a large corporation: Prudential's agent failed to notify another agent (Barney & Hughes) of certain facts; the preparer of the transmittal letter in Chicago failed to incorporate certain information in the instructions to Barney & Hughes. There is no direct or indirect evidence that such omissions were deliberate, motivated by desire for an advantage, or resulted from anything other than corporate confusion.

However, our inquiry does not cease with the determination that Prudential's conduct does not evidence an independent tort of a reprehensible nature. We must also ask whether "elements of fraud, malice, gross negligence or oppression mingle" with the breach of the contractual promises made by Prudential so as to support an award of punitive damages. See *Hibschman Pontiac, Inc. v. Batchelor* (1977), 266 Ind. 310, 362 N.E.2d 845; *Vernon Fire & Cas. Ins. Co. v. Sharp* (1976), 264 Ind. 599, 349 N.E.2d 173; *Joseph Schlitz Brewing Co. v. Central Beverage Co., Inc.* (1977), 172 Ind. App. 81, 359 N.E.2d 566; *Jones v. Abriani* (1976), 169 Ind. App. 556, 350 N.E.2d 635.

---

22. See Judge Garrard's concurring opinion in *Hibschman Pontiac, Inc. v. Batchelor* (1976), Ind. App., 340 N.E.2d 377, for an analysis of the descriptive terms used to characterize the reprehensible conduct supporting an award of punitive damages in tort.

An analysis of these cases forces the conclusion that the "tortious conduct" involved is indicative of a state of mind evidencing bad faith: auto dealer avoiding repairs until warranty period expired (*Hibschman*); insurer refusing to pay claimant as means of forcing a third party settlement (*Vernon*); brewer terminating agreement with liquor wholesaler in violation of statute (*Joseph Schlitz Brewing Co.*); seller refusing to return deposit upon buyer's rejection of defective mobile home (*Jones*).[23]

Again, Prudential's behavior by any fair appraisal falls short of "fraud, malice, gross negligence, or oppression." Gross negligence as such, use in this context, has not been defined, but it is reasonable to assume that it refers to the same kind of oppressive conduct symbolized by fraud or malice. *See* 25 C.J.S. *Damages* § 123(8), at 1147 (1966).

Thus, there is no basis for an award of punitive damages either as an independent tort or accompanying breach of contract.

Compensatory Damages

CONCLUSION — The evidence is insufficient to sustain compensatory damages in the amount awarded.

Executive was awarded compensatory damages of Four Hundred Seventy-five Thousand ($475,000.00) Dollars. If we assume, without deciding, that all the items listed by McCain (except "anticipated profits") could properly be considered as a basis for compensatory damages, the total reached is Four Hundred Twenty-eight Thousand Six Hundred Thirty-six and 26/100 ($428,636.26) Dollars—leaving Forty-six Thousand Three Hundred Sixty-three and 74/100 ($46,363.74) Dollars to be accounted for from another source. The only other source is the sum of Two Hundred Thousand ($200,000.00) Dollars representing "anticipated profits." McCain over objection made the conclusory statement that profits from the venture were anticipated to be Two Hundred Thousand ($200,000.00) Dollars. No testimony accompanied this conclusion as to the method by which the calculation was made.

23.   *Hibschman* uses the phrase "willful disregard of the right" (362 N.E.2d at 848) and *Vernon*, "[act] in an 'intentional and wanton' manner" (349 N.E.2d at 184).

The only evidence which conceivably would have permitted the jury to mathematically compute profits came in part from Sweeney. He testified the best offer he received for any of Executive's lots was for four of them in the sum of Twenty-seven Thousand Six Hundred ($27,600.00) Dollars, or Six Thousand One Hundred Twenty-five ($6,125.00) Dollars per lot. But he went no further, did not compute the estimated gross sales price of all the lots and deduct expenses.

Elsewhere in the record is evidence that Executive would have incurred promotional and sales expense for as much as One Hundred Fifty-three Thousand ($153,000.00) Dollars. No other possible expenses are indicated, or any inference that One Hundred Fifty-three Thousand ($153,000.00) Dollars would constitute total expense of the project. The most that is indicated by the meager evidence as to profits is that there could have been a *gross* profit of Three Hundred Six Thousand Three Hundred Seventy-five ($306,375.00) Dollars, which, with some gymnastics, is arrived at by assuming that all the lots would be sold at the high price offered for the four lots. With this assumption, and there was no such evidence, the gross sales price of the lots would conceivably be Four Hundred Fifty-nine Thousand Three Hundred Seventy-five ($459,375.00) Dollars, i.e., Six Thousand One Hundred Twenty-five ($6,125.00) Dollars per lot times seventy-five (75) lots. With indicated sales and promotion expense of One Hundred Fifty-three Thousand ($153,000.00) Dollars, one could timidly suggest the *gross* profits from lot sales would be Three Hundred Six Thousand Three Hundred Seventy-five ($306,375.00) Dollars.

But the jury could not base any part of its Four Hundred Seventy-five Thousand ($475,000.00) Dollar verdict for compensatory damages on lost profits, which it had to do in part at least, to arrive at such a verdict. Too uncertain, too speculative.

Two principles of the law of damages coalesce to dictate this conclusion.

One, the general rule is that the amount of damages awarded must be within the scope of the evidence. *See, e.g., Wolff v.*

*v. Slusher* (1974), 161 Ind. App. 182, 314 N.E.2d 758; *Northern Indiana Pub. Serv. Co. v. Otis* (1969), 145 Ind. App. 159, 250 N.E.2d 378; *Allison v. Boles* (1967), 141 Ind. App. 592, 230 N.E.2d 784; *First Bank & Trust Co. v. Tellson* (1954), 124 Ind. App. 478, 118 N.E.2d 496.

Two, there must be some evidence on which to base an award for anticipated profits. It must be *ascertainable from the evidence* and not result from unadulterated speculation.

The lost profits can not spring into existence full blown like Athena springing from Zeus' head. The most recent authority on this subject is our decision in *Jerry Alderman Ford Sales, Inc. v. Bailey* (1972), 154 Ind. App. 632, 652-53, 291 N.E.2d 92, 106:

> Evidence of profits is not open to the objection of uncertainty where there is testimony which, while not sufficient to put the amount beyond doubt, is sufficient to enable the jury to make a fair and reasonable finding with respect thereto. *Anvil Min. Co. v. Humble* (1894), 153 U.S. 540, 38 L.Ed. 814, 14 S.Ct. 876.
>
> * * *
>
> Even, however, when the category of damage or injury, *e.g.*, loss of profit, is not remote, any sum awarded to compensate for such loss must be sustained by evidence of record. This is true even acknowledging that in many cases compensatory damages are not susceptible to absolute mathematical computation. See *Allison v. Boles* (1967), 141 Ind. App. 592, 230 N.E.2d 784. The trier of fact may not be permitted to indulge in speculation in fixing the amount to be awarded.

As stated in *American Fletcher National Bank v. Flick* (1969), 146 Ind. App. 122, 252 N.E.2d 839, 847:

> "When it is found that a harm has been caused and the only uncertainty is as to the dollar value of the harm, there can rarely be good reason for refusing, on account of such uncertainty, any damages whatever [citations omitted]. *However, there must be some evidence on which to base an award of substantial damages.*" (Emphasis partially supplied)

Nor is there any doubt the profits lost must be net profits:

Even a proper award of lost profit in instances in which property has been damaged or destroyed should be confined to a loss of net profit. Gross income is an improper measure. Plaintiff should not receive a windfall in the form of that portion of lost gross income representing expenses of operation saved by defendant's breach. See *A. T. Klemens & Son v. Reber Plumbing & Heating Co.* (1961), 139 Mont. 115, 360 P.2d 1005. *Jerry Alderman Ford Sales, Inc. v. Bailey, supra* at 652, n.6, 291 N.E.2d at 105, n.6.

Thus the judgment must be affirmed as to imposition of liability, reversed insofar as it awards punitive damages, and reversed and remanded for a new trial as to compensatory damages.

White, J. concurs.

Lybrook, J. (by designation) concurs.

NOTE—Reported at 369 N.E.2d 1117.