**COLUMBUS MEDICAL SERVICES ORGANIZATION, LLC,**
Appellant–Defendant,

v.

**LIBERTY HEALTHCARE CORPORATION, Appellee–Plaintiff.**

No. 82A04–0808–CV–466.

Court of Appeals of Indiana.

Aug. 12, 2009.

Reed S. Schmitt, Rhine Ernest LLP, Evansville, IN, Sean P. McDevitt, Pepper Hamilton, LLP, Berwyn, PA, Attorneys for Appellant.

David V. Miller, Mary Lee Schiff, Ziemer Stayman Weitzel & Shoulders, LLP, Evansville, IN, Attorneys for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Appellant-defendant Columbus Medical Services Organization, LLC ("Columbus"), appeals from the judgment entered in favor of appellee-plaintiff Liberty Healthcare Corporation ("Liberty") following a bench trial on Liberty's complaint against Columbus. Columbus argues that the trial court erred by entering judgment for Liberty on Liberty's claim of tortious interference with a business relationship. Specifically, Columbus raises the following three issues for our review:

1. Whether the trial court's award of damages to Liberty was based on speculative evidence.

2. Whether Columbus's tortious conduct caused Liberty's damages.

3. Whether the trial court erred in holding that Liberty was entitled to

recover its attorney's fees and costs under the Crime Victims Relief Act.[1]

We affirm.

## FACTS AND PROCEDURAL HISTORY[2]

Liberty and Columbus are competing medical recruiting and staffing companies that are based in Pennsylvania. On March 28, 2002, the Indiana Department of Administration ("IDOA"), on behalf of the Family and Social Services Administration's ("FSSA") Division of Mental Health and Addiction ("DMHA"), published Request for Proposal 2–71 ("the RFP"). The RFP was a solicitation for competitive bids for the provision of psychiatric medical staffing services at the Logansport State Hospital ("the Hospital"), which is an institution dedicated to the treatment of mentally ill individuals. The State owns the Hospital and operates it through the DMHA. Since 1994, Liberty had provided medical psychiatric staff services at the Hospital; specifically, there were eight full-time Liberty psychiatrists who worked there.

*The RFP and Early Bidding Process*

The RFP provided that the contract to be awarded at the end of the bidding process was to be for a term of two years, with the possibility of a renewal at the end of the original term for another two-year term. Section 1.13 of the RFP provided that each bidder "shall submit Curricula Vitae for individuals who would fill each position posted in [the] request or provide letters of commitment for said positions...." Appellant's App. at 307. Section 2.5 provided that twenty-five percent of any submitted proposal would be evaluated based upon the bidder's knowledge and experience, including, among other things, the submission of "Curricula Vitae or letters of commitment for individuals who would fill each position...." *Id.* at 329.

Liberty, Columbus, and two other vendors—Cumberland Therapy Services ("Cumberland") and The Pennhurst Group ("Pennhurst")—prepared and submitted bids in response to the RFP. Liberty's proposal quoted a contract price of $3,219,612 per year and included Curricula Vitae ("CV") and signed Letters of Commitment from twelve qualified individuals who committed to fill the Hospital positions if Liberty was awarded the contract with the State.

Columbus's proposal quoted a contract price of $2,816,144 per year. Its proposal included Appendix C, which consisted of CVs of potential candidates for employment who Columbus represented had "shown an interest in providing services at [the Hospital]." *Id.* at 376. One of these CVs was that of Roger Jay Pentzien, a psychiatrist who lived in Avon and worked for Liberty. Dr. Pentzien had never spoken with Columbus regarding the RFP nor had he given permission for the use of his CV. The trial court later found that, in fact, Columbus had not had contact with *any* of the physicians listed in its proposal. At the time Columbus submitted the proposal and for some time thereafter, however, neither Liberty nor any of the State entities was aware of Columbus's misrepresentation.

The FSSA convened a five-member team to evaluate the submitted proposals. The proposals were evaluated according to the following criteria established by the RFP:

---

1. Ind.Code § 34–24–3–1.

2. We held oral argument in Indianapolis on May 7, 2009.

- Knowledge and Experience of the Applicant at [sic] its Professional Staff (25%)
- Quality of the Technical Approach (20%)
- Overall Management Judgment (15%)
- Total Cost (40%)
- Minority Business Participation Plan (pass/fail)

*Id.* at 704. After the first round of evaluations, the team gave total scores of 90.61% to Liberty, 89.11% to Columbus, and 81.40% to Pennhurst.[3]

### The First Best and Final Offer

Based on those scores, on June 18, 2002, the IDOA eliminated Cumberland and requested that Liberty, Columbus, and Pennhurst provide a Best and Final Offer ("BAFO") in price. The record reveals that, notwithstanding Pennhurst's inclusion in that request, the evaluation team had already concluded that only Columbus or Liberty would be able to provide all of the services to the Hospital as required by the RFP. Appellee's App. at 149–50. Most of the team members believed that either Liberty or Columbus would be awarded the contract. *Id.*

The IDOA also requested clarification on several portions of the proposals, including whether the "non-negotiable" Employment Option and Termination Employment option clauses ("the Option Clauses") were acceptable to the applicants. Columbus agreed to accept those clauses but declined to lower its price, which remained at $2,816,144 per year. Pennhurst agreed to the clauses and lowered its price to $2,556,291 per year. Liberty acknowledged its understanding that the clauses gave the State "blanket authority in ad-

vance to hire any or all of Liberty's psychiatrists at any time for free" and that the clauses also applied to its psychologists, nurse practitioners, and pharmacists. Appellant's App. at 675. Liberty indicated its intention to seek the removal of the Option Clauses during contract negotiations. Liberty lowered its price to $3,098,004.

### The Second BAFO

After receiving these responses, the evaluation team eliminated Pennhurst and gave Liberty an overall score of 90.61% and Columbus an overall score of 89.11%. Because those scores were nearly equal, the IDOA sent Columbus and Liberty a second BAFO request on July 18, 2002. The Second BAFO indicated that "the final decision for this solicitation will be based on the lowest cost to provide all services requested." *Id.* at 696, 698. In response, Liberty reduced its bid to $2,798,302.60 per year and Columbus reduced its bid to $2,759,822 per year.

On July 25, 2002, Columbus was selected for contract negotiations with the State, though the notice stated that, pursuant to Indiana Code Section 4–13–1–19, "a bidder or an offeror does not gain a property interest in the award of a contract unless the bidder or offeror is awarded the contract and the contract is completely executed." *Id.* at 707.

### Columbus's Misrepresentations

Subsequently, Liberty learned that Columbus had included Dr. Pentzien's CV in its bid without his knowledge or permission. Specifically, Columbus had represented that it had "discussed" with Dr. Pentzien the "services" he would be providing to the Hospital and that Dr. Pentzien had "shown an interest in providing services" at the Hospital for Columbus if

---

3. Because Cumberland's technical score was only 11.5%, its proposed cost was not considered and it was not given a total score.

Columbus was selected as the successful bidder. *Id.* at 376; Appellee's App. at 86–91, 251–52. Dr. Pentzien also learned of Columbus's misrepresentation. On August 15, 2002, Dr. Pentzien—who was outraged by Columbus's "cut and paste antics" with his CV and the use of his CV without his knowledge or permission—wrote a letter on his own initiative to the IDOA complaining about Columbus's actions. Appellee's App. at 168, 178–88, 190–93, 262–65. When Liberty learned that Dr. Pentzien intended to send a letter of protest, it authorized its attorney to prepare and send its own letter of protest to the IDOA.

The letters were sent to Dan Gettelfinger, the IDOA's staff counsel and director of contracting. After reviewing all relevant materials, Gettelfinger determined that Columbus's proposal should never have been scored at all by the evaluation team. On September 4, 2002, Gettelfinger prepared and issued a written opinion upholding Liberty's protest and, among other things, concluded that if the IDOA had known

> that the potential candidates listed by Columbus would not fill the positions posted as required by the RFP, the [IDOA] would not have continued with Best and Final Offers involving Columbus or proceeded into contract negotiations. Unfortunately, the [IDOA] was relying on information supplied by Columbus and had no reason to doubt the accuracy of it until this pre-award protest ensued.

Appellant's App. at 722–23. On that same date, the IDOA notified Liberty that it had been selected to enter into contract negotiations. At trial, Gettelfinger explained that Liberty was "stuck" with the contract price included in the Second BAFO:

> Well, I mean at that point Liberty did not have the discretion to withdraw or modify their bid. I mean they were stuck with an open[-]ended bid, uh, when you are in negotiation with the State, the State's got the ability to make demands and seek concessions during the contract negotiations, uh, but the, uh, the vendor is really pretty much stuck. It's sort of a one[-]way street in terms of negotiations with the State on this type of uh, issue, uh, I guess they could have walked away from the bid at that point and chose not to execute a contract but that would have had consequences, or potential consequences for the vendor. . . . [I]f the vendor walked away and didn't honor their pricing and, uh, in their proposal and the State ended incurring a greater cost to procure these services, the State could have sought cover from, uh, from Liberty as one of it's [sic] remedies.

Appellee's App. at 51. Indeed, the RFP states that

> "[a]ll proposals made in response to this RFP must remain open and in effect for a period of not less than 180 days after the due date for proposals. Any proposal accepted by the State for the purpose of contract negotiations shall remain valid until superseded by a contract or until rejected by the State."

Appellant's App. at 22 (quoting Section 1.18 of the RFP).

*Liberty's Negotiations*

Liberty and the IDOA entered into contract negotiations and Liberty was able to achieve concessions regarding the Option Clauses. Gettelfinger testified that the State's concessions regarding those clauses were material variations from the RFP. *Id.* at 908–09. Specifically, the State agreed that if Liberty released two of its physicians so that the State could hire them immediately, the State would not exercise its rights under the clauses for nine

months for each of the other positions. Under the clauses as included in the RFP, the State could have hired all of Liberty's physicians immediately. In October 2002, Liberty and the State executed a contract at Liberty's Second BAFO price. The State paid Liberty $4.5 million over the life of the two-year contract.

### The Litigation

On April 4, 2005, Liberty filed an amended complaint against Columbus.[4] Count I alleged that Columbus tortiously interfered with Liberty's business relationship with the State by knowingly and intentionally including false information in its proposal and that Columbus did so to gain an unfair business advantage over Liberty and other responsive bidders. Liberty further alleged that but for these false representations, the State would not have solicited two rounds of BAFOs and Liberty would have been awarded the contract based on its initial proposal rather than the lowered price in its Second BAFO. Count II alleged that Columbus intentionally interfered with Liberty's subcontracts with five physicians and one pharmacist with the Hospital, whom Liberty claimed resigned in response to the State's initial selection of Columbus to staff the contract. Count III sought treble damages and attorney's fees and costs under the Crime Victims Relief Act, alleging that Columbus's conduct constituted government contract procurement through false information. *See* Ind.Code § 35–43–5–11.

The four-day bench trial began on October 16, 2007. Following the bench trial, both parties submitted post-trial memoranda of law and proposed findings of fact and conclusions thereon. On June 4, 2008, the trial court ruled in favor of Liberty on Counts I and III and against Liberty on Count II in a thorough and well-reasoned fifty-eight-page order.[5] Among other things, the trial court found as follows:

136 .... the Court finds that Columbus falsely represented that its representatives had discussions with Dr. Pentzien regarding [the Hospital]....

137. Columbus'[s] representations to the State that it had discussed [the Hospital] with Dr. Pentzien and that Dr. Pentzien expressed an "interest" in working for Columbus at [the Hospital] were false and were intended to further Columbus'[s] effort to obtain ... the contract....

138. Columbus'[s] use of Dr. Pentzien's CV in its proposal and its representations to the State about that CV constituted a violation of I.C. 35–43–5–11.[6]

\* \* \*

### Damages

206. Columbus'[s] proposal ... was evaluated based upon substantial false information knowingly included by Columbus in the proposal. As a result of the inclusion of that false information, Columbus received a "technical score" close to equal of the technical score awarded ... to Liberty.

207. Because the "technical scores" of Columbus and Liberty were nearly equal, the State requested that Liberty and Columbus submit [BAFOs].

---

4. Liberty filed the original complaint on January 23, 2003.

5. Liberty did not appeal the trial court's ruling with respect to Count II.

6. The trial court made similar findings regarding Columbus's use of the CVs of Dr. Sachinder Vasudeva, Clinical Nurse Specialist Faith Ornelas, Dr. David Taylor, Dr. Ronald Schwartz, Dr. Steven L. Nelson, Dr. Robert Rogan, Dr. William Edward Foster, Dr. Timothy F. Rockcress, and Dr. Sabiah Kayan.

\* \* \*

213. Thomas J. McParland, Jr. ("McParland") is Liberty's Chief Financial Officer. He is responsible for all accounting, banking, and treasury activities of the corporation in addition to establishing budgets and participating with the business operation units in establish[ing] pricing and measuring actual results.

214. McParland is an expert in matters of financial accounting.

215. Based on Liberty's financial records, McParland calculated the amount of revenue Liberty lost as a result of the State holding Liberty to the pricing set forth in Liberty's Second BAFO....

\* \* \*

221. ... Based on the actual services for [the Hospital] that Liberty's contract personnel did perform from November 1, 2002, to October 31, 2004, if Liberty had been compensated pursuant to the prices set forth in its First BAFO ..., with its administrative costs rolled into the chargeable hourly service fees, Liberty's revenue would have been $5,028,240.00, instead of $4,541,743.00, a difference of $486,497.

\* \* \*

## CONCLUSIONS OF LAW

\* \* \*

### Count I—Tortious Interference With Business Relationship

\* \* \*

2. Under Indiana law, a "business relationship" of the kind required to support a tortious interference claim need not be evidenced by a contract.

3. Such a relationship existed between Liberty and the State because the evidence at trial established that Liberty's and the State's business relationship would have continued uninterrupted and without detrimental consequences to Liberty during 2002 if Columbus had not interfered with that relationship. *See* Restatement (Second) of Torts 766B cmt. c (1977) ("Also included [as tortious interference with a business relationship] is interference with a continuing business or other customary relationship not amounting to a formal contract.")

4. Liberty was the incumbent provider of staffing services at [the Hospital], which was one form of business relationship. Liberty also was a qualified respondent to the State's RFP ..., which thereby created a second (and related) business relationship between Liberty and the State.

5. The evidence at trial established that Columbus'[s] intentional acts in presenting false information to the State substantially impacted the actions of the State towards Liberty both as the incumbent provider of medical services to [the Hospital] and as the State considered the respective merits of Liberty's bid and Columbus'[s] bid.... This submission by Columbus of a bid containing substantial false representations, knowingly made, constituted interference by Columbus with the two distinct business relationships then existing between Liberty and the State regarding [the Hospital].

\* \* \*

7. Columbus'[s] representation to the State was intentional and false as to each and every "selected candidate" identified by Columbus in its Appendix C.

8. The very purpose of Columbus'[s] actions was to support its effort to obtain the contract ... based upon false representations and thereby to substan-

tially interfere with Liberty's business relationships with the State—that is, to overcome Liberty's proposal . . . and to replace Liberty at [the Hospital].

\* \* \*

13. This Court finds that Columbus did not act fairly or reasonably when it knowingly submitted false information to the State in order to procure a government contract.

14. Columbus'[s] conduct was dishonest and violated a specific Indiana statute, I.C. [§ ] 35–43–5–11.

15. There is no social interest that would be served by protecting Columbus'[s] right to submit false information to the State during the RFP process.

\* \* \*

22. Columbus did not seek judicial review of the IDOA's determination that its bid was nonresponsive. Consequently, Gettelfinger's ruling triggers application of the doctrine of administrative res judicata, and Columbus is now collaterally estopped from challenging the conclusions set forth in that ruling.

\* \* \*

27. Liberty has met the burden of proving by a preponderance of the evidence that Columbus acted illegally in achieving its end.

28. I.C. [§ ] 35–43–5–11, entitled "Government contract procurement through false information," provides

> A person who knowingly or intentionally provides false information to a governmental entity to obtain a contract from the governmental entity commits a Class A misdemeanor. However, the offense is a Class D Felony if the provision of false information results in financial loss to the governmental entity.

\* \* \*

33. The Court finds that the damages suffered by Liberty cannot be calculated with precision. It is impossible to know what the precise contractual arrangement would have been between Liberty and the State had Columbus not acted as it did. . . . In this case, Liberty's initial bid was higher than FSSA's estimated contract amount. Additionally, the State was going to insist that the initial bid be modified with regard to the administrative expense component. Consequently, the Court concludes that the final contract between Liberty and the State would have occurred, but would have been at a lower price than that originally bid. The Court further concludes that the final contract price could be estimated to be that reflected in Trial Ex. 141, and that therefore, the Court concludes that Liberty was damaged herein in the amount of $486,497.00.

\* \* \*

*Count III—Liberty Claim Under Indiana's Crime Victim's Relief Act*

41. In Count III . . ., Liberty has alleged a civil cause of action under Indiana's Crime Victim's Relief Act ("CVRA") because Liberty has suffered a pecuniary loss as a result of Columbus'[s] violation of I.C. [§ ] 35–43–5–11. . . . This Court has ruled that Columbus violated IC. [§ ] 35–43–5–11[, which] is one of the several statutes describing crimes against property proscribed by the Indiana Legislature in I.C. [Article] 35–43.

42. I.C. [§ ] 34–24–3–1 provides that if a "person" suffers a pecuniary loss as a result of a violation of one of the provisions of I.C. [Article] 35–43. that person

may bring a civil action against the person who caused the loss.

43. The term "person" as used in this statute includes a corporation, limited liability company, partnership or unincorporated associations. I.C. [§ ] 35–41–1–22.

44. Liberty is a "person" that suffered a pecuniary loss as a result of Columbus'[s] violation of I.C. [§ ] 35–43–5–11 and, thus, it is entitled to bring a civil action against Columbus under I.C. [§ ] 35–24–3–1 for causing that loss.

\* \* \*

49. In this case, Liberty has proven its claim under the CVRA, that is, Liberty has proved that Columbus violated one of the specific code sections outlined in I.C. [Article] 35–43 and that Liberty suffered substantial monetary damages as a direct result of Columbus'[s] illegal conduct.

\* \* \*

51. The Court hereby exercises its discretion and does not order that Liberty recover treble damages from Columbus. However, the Court concludes that Liberty should recover from Columbus the actual damages set forth herein in Conclusion 33 plus the other expenses listed in I.C. [§ ] 34–24–3–1, in such amounts that are reasonable under the circumstances of the case and in view of the Court's damage determination.

*Id.* at 17–75 (some internal citations omitted). On July 2, 2008, the trial court held a hearing regarding Liberty's attorney's fees and costs, ultimately ruling that Liberty was entitled to recover fees and costs in the amount of $473,468.04. On July 8, 2008, the trial court entered its final judgment against Columbus in the total

amount of $959,965.04. This appeal ensued.

## DISCUSSION AND DECISION

### Standard of Review

The trial court entered findings of fact and conclusions thereon pursuant to Indiana Trial Rule 52(A). We may not set aside the findings or judgment unless they are clearly erroneous. *Menard, Inc. v. Dage–MTI, Inc.*, 726 N.E.2d 1206, 1210 (Ind.2000). First, we consider whether the evidence supports the factual findings. *Id.* Second, we consider whether the findings support the judgment. *Id.* "Findings are clearly erroneous only when the record contains no facts to support them either directly or by inference." *Quillen v. Quillen*, 671 N.E.2d 98, 102 (Ind.1996). A judgment is clearly erroneous if it relies on an incorrect legal standard. *Menard*, 726 N.E.2d at 1210.

In conducting our review, we give due regard to the trial court's ability to assess the credibility of witnesses. *Id.* While we defer substantially to findings of fact, we do not do so to conclusions of law. *Id.* We do not reweigh the evidence; rather, we consider the evidence most favorable to the judgment with all reasonable inferences drawn in favor of the judgment. *Yoon v. Yoon*, 711 N.E.2d 1265, 1268 (Ind. 1999).

The elements of tortious interference with a business relationship are (1) the existence of a valid business relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from the defendant's wrongful interference with the relationship. *AutoXchange.com, Inc. v. Dreyer and Reinbold, Inc.*, 816 N.E.2d 40,

51 (Ind.Ct.App.2004).[7] Additionally, our Supreme Court has held that "this tort requires some independent illegal action." *Brazauskas v. Fort Wayne–South Bend Diocese, Inc.,* 796 N.E.2d 286, 291 (Ind. 2003). On appeal, however, Columbus contends only that: (1) the trial court erroneously speculated in calculating Liberty's damages; (2) there is no causal connection between Columbus's actions and the damages suffered by Liberty; and (3) the court erred in applying the Crime Victims Relief Act. We address each argument in turn.

### Issue One: Calculation of Liberty's Damages

 Columbus first argues that the trial court's assessment of Liberty's damages is pure speculation. We employ a limited standard of review when addressing challenges to a trial court's award of damages. *Prime Mortgage USA, Inc. v. Nichols,* 885 N.E.2d 628, 656 (Ind.Ct.App. 2008). So long as the amount awarded is supported by evidence in the record, no degree of mathematical certainty is required. *Id.* In reviewing the award, we neither reweigh evidence nor assess witness credibility and will consider only the evidence favorable to the award. *Id.* "When the specific issue on review relates to the award of damages, a damage award should not be reversed if it is within the scope of the evidence before the trial court." *G & N Aircraft Inc. v. Boehm,* 743 N.E.2d 227, 234 (Ind.2001) (citing *Dunn v. Cadiente,* 516 N.E.2d 52, 54 (Ind. 1987)).

 The trial court's damage award to Liberty is within the scope of the evidence that was before the court. The sequence of bids from Columbus and Liberty to the State provided the trial court with an evidentiary framework and boundaries within which damages could be determined. Indeed, by examining the bids, McParland testified that Liberty's damages could be measured under any one of four possible calculations, resulting in Liberty's lost profits ranging from $486,497 to $1,000,517. Each alternative assumed the State would have accepted either Liberty's first proposed contract or Liberty's First BAFO. The court utilized the calculation that assessed Liberty's lost profits under the First BAFO with administrative costs included in Liberty's fees. As such, the court assessed Liberty's lost-profit damages at $486,497, which, again, was within the scope of the evidence before the court.[8]

In assessing Liberty's damages, the trial court expressly, and correctly, acknowledged that "the damages suffered by Liberty cannot be calculated with precision [because i]t is impossible to know what the

---

7. Columbus explicitly concedes a number of these elements: "[a]lthough Columbus . disagrees with the trial court's factual determinations that Columbus interfered with Liberty's proposal and acted without justification, Columbus does not contest these finding[s] on appeal nor does it contest its awareness of the contract." Appellant's Br. at 24 n. 2. Although Columbus does not mention the element of a valid business relationship in that footnote, it also does not include a specific argument regarding that element in its appellate brief. Further, counsel conceded the existence of a valid business relationship—even in the absence of a written contract—at oral

argument. Thus, we will not address those elements of the tort.

8. At oral argument, Columbus admitted that Liberty sustained some damages as a result of Columbus's misrepresentations. Specifically, Columbus conceded that Liberty was damaged to the extent of the cost of preparing and submitting the Second BAFO. We agree that Liberty sustained those damages because of Columbus's fraudulent statements. Unfortunately, Liberty presented no evidence of those damages at trial. Therefore, there is no way to calculate Liberty's costs in that regard.

precise contractual arrangement would have been between Liberty and the State had Columbus not acted as it did." Appellant's App. at 70. The fact that absolute certainty in Liberty's damages cannot be computed is undeniable. But tort damages do not require absolute certainty, and the trial court properly did not end its analysis with that statement.

This is not a breach of contract action. As our Supreme Court has recognized, "the measure of damages in a contract action is limited to those actually suffered as a result of the breach which are reasonably assumed to have been within the contemplation of the parties at the time the contract was formed." *Erie Ins. Co. v. Hickman*, 622 N.E.2d 515, 519 (Ind.1993) (citing *Ind. & Mich. Elec. Co. v. Terre Haute Indus., Inc.*, 507 N.E.2d 588, 607 (Ind.Ct.App.1987)). Our Supreme Court has long taken a limited view of profits lost from future, third-party relationships as an acceptable measure of consequential damages for the breach of a contract. *See Decatur County AG–Servs., Inc. v. Young*, 426 N.E.2d 644, 647 (Ind.1981) (collecting cases). But this case is based on a tort and not on a breach of contract.

It is well-established that, "in tort, all damages directly traceable to the wrong and arising without an intervening agency are recoverable." *Erie Ins. Co.*, 622 N.E.2d at 519. Also, when "[i]t [is] the tortious act of [an] appellant which created this situation[,] . . . all doubts and uncertainties as to the proof of the exact measure of damages must be resolved against it." *City of Ft. Wayne v. Capehart–Farnsworth Corp.*, 127 Ind.App. 412, 424, 142 N.E.2d 442, 448 (1957). "The most elementary conception of justice and public policy require that the wrongdoer shall bear the risk of the uncertainty which his own wrong created." *Id.*

Indiana law permits the award of lost profits as the measure of damages in a tort action. But the law does not require that those damages be ascertainable with absolute certainty. As this court has held, "Indiana recognizes recovery of lost profits in a tort action. . . . There is no requirement of any particular degree of mathematical certainty in assessing damages, and where there is any doubt as to the exact proof of damages, such uncertainty must be resolved against the wrongdoer." *Babson Bros. Co. v. Tipstar Corp.*, 446 N.E.2d 11, 15 (Ind.Ct.App.1983). Rather than looking for certainty, we look to the "fair and reasonable" inferences from the evidence:

> less certainty is required to prove amount of loss than is required to prove the fact that profits were in truth lost. Evidence of profits is not open to the objection of uncertainty where there is testimony which, while not sufficient to put the amount beyond doubt, is sufficient to enable the [factfinder] to make a fair and reasonable finding with respect thereto.

*Jerry Alderman Ford Sales, Inc. v. Bailey*, 154 Ind.App. 632, 652, 291 N.E.2d 92, 106 (1972) (citations omitted), *clarified on other grounds on reh'g*, 154 Ind.App. 632, 294 N.E.2d 617 (1973), *trans. denied.*

Again, all damages directly related to a party's tortious behavior and arising without an intervening agency are recoverable in a tort action, and the fair and reasonable inferences from the evidence shall be construed against the tortfeasor. Here, it cannot be seriously questioned that Columbus's intentional, fraudulent participation affected the dynamics of the RFP process by enabling the State to bargain with what it thought were two responsible and responsive bidders. Thus, as a direct result of Columbus's tortious participation in the RFP process, Liberty reduced its contract

proposal to the State, which bound Liberty in subsequent negotiations.[9] While we cannot say with certainty what, if any, final contract price Liberty would have obtained without Columbus's tortious interference, the evidence strongly suggests that the State would not have been entertaining competitive bids and that Liberty would have been bidding against itself and not against Columbus. But Columbus, an unqualified bidder, played a spoiler's role and skewed the negotiations. Columbus should not be allowed to escape liability for Liberty's lost profits merely because the complexities of the RFP process preclude the calculation of damages with mathematical certainty. On these facts, Columbus is not entitled to benefit from uncertainty in the damage award.[10] *See City of Ft. Wayne*, 127 Ind.App. at 424, 142 N.E.2d at 448.

We will affirm a damage award for lost profits as long as "there [is] some evidence on which to base an award for [the] anticipated profits. It must be *ascertainable from the evidence* and not result from unadulterated speculation." *Prudential Ins. Co. v. Executive Estates, Inc.*, 174 Ind.App. 674, 702, 369 N.E.2d 1117, 1133 (1977) (emphasis original). Here, while there is uncertainty in the exact measure of Liberty's damages, that uncertainty does not rise to the level of "unadulterated speculation." *See id.* The trial court found that Columbus and Liberty frequently and contentiously "compete with each other to procure state contracts."

Appellant's App. at 18. As such, the damages Liberty suffered as a result of Columbus's tortious conduct were not unanticipated.

The trial court's damage award to Liberty of $486,497 in lost profits is directly related to Columbus's fraudulent behavior. The specific amount awarded to Liberty is based on McParland's testimony, which itself was based on a mathematical calculation of the difference between the profits that would have been realized under the First BAFO and the profits realized under the contract that was eventually accepted by the State. While not an exact measure of damages, it was fair and reasonable on these facts for the trial court to utilize that testimony to resolve any uncertainty against Columbus, and the damage amount chosen by the trial court was within the scope of the evidence before it. Accordingly, the trial court did not err in its assessment of Liberty's damages.

### Issue Two: Causal Connection

Columbus also argues that its actions during the RFP process were not the cause of the damages sustained by Liberty. It observes that the RFP reserved for the State the right to hire any vendor employee assigned to the Hospital at any time at no cost to the State. But after the State had disqualified Columbus, Liberty negotiated a material change in the Option Clauses, which permitted the State to hire only two Liberty doctors during the first nine months and provided Liberty with a

9. Again, the RFP required "[a]ll proposals made ... must remain open and in effect for a period of not less than 180 days.... Any proposal accepted by the State ... shall remain valid until superseded by a contract or until rejected by the State." Appellant's App. at 22.

10. The dissent notes some irony in holding Columbus liable for Liberty's lost profit when that lost profit was money saved by the State

in the bidding process. We cannot agree that it is sound public policy to rationalize the fraudulent behavior of an unqualified bidder because that behavior may have saved the State money on one contract. Over the long run it is more beneficial to the State and its taxpayers, and better public policy, to maintain the integrity of the bidding process and to hold bidders accountable.

protected stream of revenue. In Columbus's words, "this change allowed Liberty to sign a much better contract ... and Liberty, not Columbus, caused that to happen. That undisputed fact interrupts any causal connection between Columbus'[s] actions and any damages claimed by Liberty." Appellant's Brief at 21.

As an initial matter, we note that the trial court awarded damages to Liberty based on the profit difference between Liberty's First BAFO and its eventual contract with the State. At the time Liberty submitted its First BAFO, Liberty signaled its intention to negotiate the amendment or removal of the Option Clauses. That is, even if Columbus had not interfered and Liberty had won the bid with its First BAFO, Liberty would still have sought to modify those clauses. Accordingly, we cannot say that the changes in the Option Clauses "interrupt[ed] any causal connection between Columbus'[s] actions" and Liberty's damages. *See id.*

In any event, Columbus's argument on this issue is less than clear. We agree that Liberty's negotiation of the Option Clauses led to a material change in the agreement that was advantageous to Liberty. But Columbus points to no evidence showing what, if any, economic impact the amended Option Clauses had on the price of Liberty's contract with the State. In sum, Columbus has alleged, but has not shown, that Liberty's negotiation of the Option Clauses with the State broke the causal connection so as to relieve Columbus of liability for Liberty's damages. Columbus has not met its burden on appeal of demonstrating reversible error on this issue.

### Issue Three: Crime Victims Relief Act

 Finally, Columbus contends that the trial court erroneously awarded Liberty its attorney's fees and costs pursuant to the Crime Victims Relief Act ("CVRA"). The CVRA is a penal statute and, as such, is to be strictly construed by the courts. *Johnson v. Naugle,* 557 N.E.2d 1339, 1344 (Ind.Ct.App.1990).

The CVRA provides, in relevant part, as follows:

If a person suffers a pecuniary loss as a result of a violation of IC 35–43, ... the person may bring a civil action against the person who caused the loss for the following:

(1) An amount not to exceed three (3) times the actual damages of the person suffering the loss.

(2) The costs of the action.

(3) A reasonable attorney's fee....

I.C. § 34–24–3–1. The trial court found that Columbus violated Indiana Code Section 35–43–5–11, which defines the crime of government contract procurement through false information: "A person who knowingly or intentionally provides false information to a governmental entity to obtain a contract from the governmental entity commits a Class A misdemeanor. However, the offense is a Class D felony if the provision of false information results in financial loss to the governmental entity."

Columbus argues that Liberty is not entitled to seek relief under the CVRA because the false procurement of a government contract statute is designed to protect the government, not a private party such as Liberty. Columbus emphasizes that the offense is enhanced only if the governmental entity suffers a financial loss as a result of the false information. Thus, Columbus insists that this statute is designed to protect only the government rather than a non-governmental third party.[11]

---

11. Columbus also relies in large part upon an unreported case from the Southern District of

We cannot agree. The plain language of section 35–43–5–11's first sentence does not limit relief to a governmental entity. Certainly, the offense is enhanced if a governmental entity suffers a financial loss, but the statute unambiguously states that if a person knowingly or intentionally provides false information to a governmental entity to obtain a contract from the governmental entity, that person has committed a crime. Here, the trial court concluded that Columbus knowingly and intentionally provided false information to the State to obtain the contract—a conclusion that Columbus does not dispute on appeal. Thus, pursuant to the plain language of the statute, Columbus has committed this crime, unambiguously bringing it within the scope of the CVRA. *See White v. Ind. Realty Assocs.*, 555 N.E.2d 454, 456 (Ind.1990) (holding that a criminal conviction is not a condition precedent to recovery under the CVRA).

Further, the CVRA unambiguously provides that a "person" who suffers a pecuniary loss as a result of the violation of one of the included statutes—including Indiana Code Section 35–43–5–11—is entitled to seek relief under the Act. The term "person" includes corporations, limited liability companies, partnerships, and unincorporated associations. I.C. § 35–41–1–22. Liberty is, therefore, a "person" within the meaning of the CVRA. Moreover, as noted above, at oral argument Columbus conceded that Liberty suffered a financial loss, namely, the cost of preparing and submitting the Second BAFO. As such, Liberty's pecuniary loss is sufficient to trigger the CVRA and Liberty is entitled to recover according to the statute's terms, namely, damages, attorney's fees, and costs. Columbus has not appealed the tri-

al court's conclusion regarding the amount of those damages, fees, and costs, and we affirm that portion of the trial court's judgment as well.

## Conclusion

In sum, we hold that the damages the trial court awarded to Liberty were within the scope of the evidence before the court, that Liberty's renegotiation of the Option Clauses did not interrupt the causal connection between Columbus's tortious conduct and Liberty's damages, and that the trial court correctly applied the CVRA to this action. Accordingly, we affirm the trial court in all respects.

Affirmed.

CRONE, J., concurs.

BAKER, C.J., concurs in part and dissents in part with separate opinion.

BAKER, Chief Judge, concurring in part and dissenting in part.

I respectfully dissent from the majority's decision to affirm the damages award entered by the trial court. Although Columbus undeniably committed bad acts during the bidding process, I believe that the trial court's damages award to Liberty was simply too speculative. I agree with the trial court's conclusion that "[i]t is impossible to know what the precise contractual arrangement would have been between Liberty and the State had Columbus not acted as it did." Appellant's App. p. 70.

Although I appreciate the trial court's attempt to serve equity and right the wrongs committed by Columbus, there is simply no way of knowing what would have happened if Columbus had behaved properly, been eliminated sooner, or not been

---

Indiana. We remind Columbus that not-for-publication decisions have no precedential value and decline to consider that decision.

Ind. Appellate Rule 65(D); *Weldon v. Asset Acceptance, LLC,* 896 N.E.2d 1181, 1185 n. 3 (Ind.Ct.App.2008).

involved at all. No representative of the IDOA testified that if Columbus had been eliminated sooner, the contract would have been awarded to Liberty at its First BAFO price with the negotiated omission of the employment clauses. The only evidence supporting the damages award was McParland's testimony. McParland, however, merely made a series of calculations based on different sets of assumptions. The trial court selected the calculation based upon Liberty's First BAFO, but I believe that decision requires speculation to an untenable degree. Thus, in my opinion, the decision to award Liberty damages based on its First BAFO is simply not supported by sufficient evidence in the record.

I also believe that the result reached by the majority leads to bad public policy. No one held a gun to Liberty's proverbial head and forced it to lower its bid. Liberty chose to do so. Admittedly, its decision was based on faulty, likely fraudulent, information, but it was a choice, nonetheless. Liberty is essentially arguing that but for Columbus's misrepresentations, the taxpayers of Indiana would have had to pay significantly more money for Liberty's services than they did following the Second BAFO. As a matter of public policy, I do not believe we should award damages to a company that decided it was able and willing to lower its bid on a project—even if that decision was based on a competitor's fraud.

As an aside, I note that at oral argument, Columbus admitted that Liberty sustained some damages as a result of Columbus's misrepresentations. Specifically, Columbus conceded that Liberty was damaged to the extent of the cost of preparing and submitting the Second BAFO. I agree that Liberty sustained those damages because of Columbus's fraudulent statements. Unfortunately, Liberty pre-

sented no evidence of those damages at trial. Therefore, there is no way to calculate Liberty's costs in this regard.

I concur with the majority's conclusion that the Crime Victims Relief Act applies herein. Therefore, I would reverse the damages award, order nominal damages of $1 to Liberty, treble those damages pursuant to the Crime Victims Relief Act for a total award of $3, and affirm the trial court's award of $473,468.04 for Liberty's attorney fees and litigation expenses.