**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**

ATTORNEY FOR APPELLANT:

**STEPHEN R. BUSCHMANN**
Thrasher Buschmann & Voelkel, P.C.
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**F. ANTHONY PAGANELLI**
Taft Stettinius & Hollister LLP
Indianapolis, Indiana

**FILED**
Apr 03 2013, 9:08 am

CLERK
of the supreme court,
court of appeals and
tax court

# IN THE
# COURT OF APPEALS OF INDIANA

CHRISTOPHER SNYDER,                    )
                                       )
            Appellant,                 )
                                       )
        vs.                            )        No. 29A02-1207-CT-592
                                       )
CLASSIC RESTAURANT SERVICES, LLC,      )
                                       )
            Appellees.                 )

APPEAL FROM THE HAMILTON CIRCUIT COURT
The Honorable Paul A. Felix, Judge
Cause No. 29C01-1205-CT-5427

**April 3, 2013**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Christopher Snyder appeals from the trial court's grant of a preliminary injunction against him and in favor of Classic Restaurant Services, LLC (Classic). Snyder presents the following consolidated and restated issues for review:

1.  Did the trial court abuse its discretion when it concluded that Classic had a reasonable likelihood of success on the merits on its claim for tortious interference with Classic's business relationships?

2.  Did the trial court abuse its discretion when it concluded that Classic had established a reasonable likelihood of success on the merits on its claim for misappropriation of trade secrets?

We affirm.

Classic is an Indiana limited liability company that provides heating, air conditioning, refrigeration, and cooking equipment sales and service predominantly to restaurants throughout central Indiana. Rick Petrie is a twenty-five-percent owner of Classic and has managed the company since its inception in 2009. Prior to this, Petrie was an employee of PFC Management Company (PFC), which owns all or most of the Denny's restaurants in central Indiana. PFC is a joint owner of Classic. Aside from Denny's, Classic's largest customers in 2011 and 2012 included Golden Corral, Ruby Tuesday, Jimmy John's, and Subway. Classic employs less than eight individuals and operates in a highly competitive market.

Snyder began working part-time as a service tech for PFC in early 2009 and shortly thereafter became a full-time service tech for Classic. Snyder did not have a non-compete agreement with Classic and was expressly permitted to do residential jobs on the side while using his company vehicle. During his more than three years of employment, Snyder

2

serviced all of Classic's customers.

By the summer of 2011, Snyder began efforts to start his own competing business and take customers from Classic. Without showing his hand, Snyder repeatedly asked Petrie about wholesale-to-retail markups, but Petrie refused to provide this information. By July 2011, and without Classic's knowledge, Snyder had succeeded in taking the business of two Subway restaurants from Classic. He serviced these restaurants after hours on his own behalf and to the exclusion of Classic, and he used his company-owned vehicle while making these calls.

In the fall of 2011, Snyder unsuccessfully attempted to solicit Ruby Tuesday restaurants to transfer their business to him. Although he was still employed by Classic, Snyder had prepared to compete by purchasing and outfitting a van, obtaining business cards and insurance, and printing marketing flyers. He distributed his flyers to several restaurants in central Indiana. He organized his new company, A Plus Air LLC, by filing articles of organization with the Indiana Secretary of State in February 2012.

Around February 2012, Snyder directly solicited Golden Corral to transfer its substantial business away from Classic and to A Plus Air. When speaking with management of Golden Corral, Snyder referred to Classic's service as sub-par and indicated that he could do better. By his own admissions, Snyder failed to inform Classic of customer complaints and, instead, "commiserate[ed]" with Classic's customers when they expressed dissatisfaction. *Transcript* at 36. While still employed by Classic, Snyder filed an application for qualification as a Golden Corral vendor in February or March 2012. After

3

Snyder became an approved vendor, he entered into discussions with Golden Corral's district manager, Carl Horton. In March 2012, Horton gave Snyder the "green light" to go out on his own, agreeing to give most of Golden Corral's business to A Plus Air. *Id.* at 155. Snyder asked if the transition could be delayed until late April so that he could use his remaining paid vacation days at Classic for an upcoming trip to Florida. Horton agreed.

Upon returning from vacation on Saturday, April 21, Snyder sent a text message to Petrie, indicating that he was resigning effective immediately. He also notified Petrie of a specific Denny's location where he had left the company vehicle and equipment. Snyder, however, had retained a binder that contained contact information of all Classic's vendors and customers. This list was marked confidential and Classic employees had been directed on numerous occasions by Petrie to keep its contents confidential. Snyder continued to use the list for his new business.

The following Monday morning, April 23, Snyder made his first service call at Golden Corral as A Plus Air. Shortly after Snyder's resignation, Petrie noticed a sharp decline in the volume of service calls from Golden Corral. Petrie began calling the managers of the various Golden Corral restaurants and learned that Snyder now had the bulk of their business.

Doris Warswick, Classic's office manager, had been aware for some time of Snyder's intention to go out on his own. In fact, he told her in July 2011 of his efforts to solicit Ruby Tuesday. Moreover, Snyder had sought pricing information from her, which she could not provide at the time because only Petrie had this type of information.

The day before Snyder sent his text-message resignation, Warswick provided Classic

4

with notice of her own pending resignation. Thereafter, early in the morning on her last day of work, April 27, Warswick surreptitiously emailed two of Classic's business documents to Snyder, routing the emails first through her personal email account.[1] Warswick gave Snyder advance notice that these would be coming. The documents were correspondence from one of Classic's largest customers, Ruby Tuesday, for which Classic was the primary contractor in the area. The first document outlined Ruby Tuesday's new program for facilities management and directions on how to continue to be a preferred contractor, and the second document was a table of HVAC services part mark-ups for USM Tech, Ruby Tuesday's new facilities maintenance and management provider. With this information in hand, Snyder once again began soliciting Ruby Tuesday's business. A manager at one of these restaurants warned Petrie of this within a couple weeks after Snyder resigned.

Upon discovering many of the facts outlined above, Classic promptly filed the instant action on May 24, 2012.[2] Along with its complaint, Classic filed a verified motion for temporary restraining order and preliminary injunction. The trial court issued a temporary restraining order that same day and scheduled a preliminary injunction hearing for June 6, which was later rescheduled for June 13. At the hearing, Classic presented two grounds in support of its motion for a preliminary injunction: (1) Snyder's misappropriation of trade secrets, which Classic alleged were the customer list and the two documents sent by

---

[1]  Warswick also deleted messages from both her sent-items folder and her deleted-items folder before leaving Classic's employ.

[2]  Snyder has not provided us with a copy of the complaint or any other relevant pleadings in this case.

Warswick to Snyder and (2) tortious interference with Classic's business relationships. Classic asked that Snyder be enjoined from "continuing to interfere with the relationships that Classic had with customers while he was employed". *Id.* at 127. This primarily included specific Golden Corral, Ruby Tuesday, and Jimmy John's restaurants in central Indiana. Otherwise, Classic agreed that Snyder should be free to compete in the local restaurant HVAC business. Classic noted that the extent of harm caused by Snyder was still unknown and new information continued to be discovered through expedited discovery. Further, Petrie testified that Snyder had already taken Golden Corral, one of Classic's biggest accounts, and that if he succeeded in taking the handful of other big accounts (such as Ruby Tuesday and Jimmy John's) Classic would go out of business.

At the conclusion of the evidentiary hearing, the trial court took the matter under advisement and directed the parties to submit proposed findings of fact and conclusions of law. On June 20, 2012, the trial court issued its order granting Classic's request for a preliminary injunction and including detailed findings of fact and conclusions of law. The court specifically enjoined Snyder from:

> (a) having any business dealings, directly or indirectly, with any of the Golden Corral restaurants, Ruby Tuesday restaurants, Jimmy John's restaurants, and/or Subway restaurants; specifically, the Indianapolis Subway Restaurants, whose business he solicited for his own benefit while still employed by Classic; and (b) making any use whatsoever, directly or indirectly, of the information contained on the customer list introduced (under seal and subject to oral protective order) as Exhibit 10 at the preliminary injunction hearing in this matter.

*Appendix* at 25-26. Snyder appealed this interlocutory order, claiming the trial court abused its discretion in granting the preliminary injunction.

6

It is within the sound discretion of the trial court to grant or deny a preliminary injunction, and this court's review is limited to whether there has been a clear abuse of discretion. *State v. Econ. Freedom Fund*, 959 N.E.2d 794 (Ind. 2011), *cert. denied*. In this regard, we consider the evidence in the light most favorable to the judgment and construe findings together liberally in favor of the judgment. *Burns-Kish Funeral Homes, Inc. v. Kish Funeral Homes, LLC*, 889 N.E.2d 15 (Ind. Ct. App. 2008).

> Generally, to obtain a preliminary injunction, a party must demonstrate the following four elements by a preponderance of the evidence: (1) there exists a reasonable likelihood of success at trial; (2) the remedies at law are inadequate, thus causing irreparable harm pending resolution of the substantive action; (3) the threatened injury to the movant outweighs the potential harm to the nonmovant from the granting of an injunction; and (4) the public interest would not be disserved by granting the requested injunction.

*State v. Econ. Freedom Fund*, 959 N.E.2d at 803. Only the first element is at issue in this appeal.[3]

The trial court concluded that Classic had established a reasonable likelihood of success at trial as to both of its legal bases (misappropriation of trade secrets and tortious interference with business relationships) for seeking the preliminary injunction. Snyder disputes both of these legal bases.

---

[3] Snyder makes no claim that Classic failed to establish the third and fourth elements. Although he does assert in passing that Classic failed to establish that its remedies at law for tortious interference were inadequate, he presents no real argument in support of this assertion. Therefore, we find the issue waived. *See Lyles v. State*, 834 N.E.2d 1035 (Ind. Ct. App. 2005), *trans. denied*.

1.

With respect to the tortious interference claim alleged here, Snyder argues that a preliminary injunction is not a proper remedy. Although he acknowledges that he owed a fiduciary duty of loyalty to Classic while employed, Snyder baldly asserts that because he is no longer employed by Classic, he is no longer bound by the fiduciary duty and should be able to compete against Classic in any way because there exists no non-compete agreement.

The elements of tortious interference with a business relationship are: (1) the existence of a valid business relationship; (2) the defendant's knowledge of the existence of the relationship; (3) the defendant's intentional interference with that relationship; (4) the absence of justification; and (5) damages resulting from the defendant's wrongful interference with the relationship. *Columbus Med. Servs. Org., LLC v. Liberty Healthcare Corp.*, 911 N.E.2d 85 (Ind. Ct. App. 2009). Our Supreme Court has also held that "this tort requires some independent illegal action." *Brazauskas v. Fort Wayne–South Bend Diocese, Inc.,* 796 N.E.2d 286, 291 (Ind. 2003), *cert. denied*. Illegal action in this context does not necessarily mean criminal action, but instead sufficiently wrongful action as in breach of a contractual or common law duty. *See Economation, Inc. v. Automated Conveyor Sys., Inc.*, 694 F. Supp. 553 (S.D. Ind. 1988).

Here, the trial court determined that the fourth element (absence of justification) and the additional requirement of illegal action were satisfied by Snyder's breach of his fiduciary duty of loyalty while employed by Classic. *See SJS Refractory Co., LLC v. Empire Refractory Sales, Inc.*, 952 N.E.2d 758 (Ind. Ct. App. 2011) (describing the fiduciary duty of

8

loyalty owed by an employee to his or her employer).[4] Specifically, the court found in part: "while he was Classic's employee and agent, Mr. Snyder engaged repeatedly in self-dealing and other acts of disloyalty to his employer and principal, thereby breaching his fiduciary duties to Classic." *Appendix* at 19.

On appeal, Snyder does not dispute that he actively violated his fiduciary duties to Classic during the last year of his employment. He argues only that this prior misconduct should not affect his ability to compete with Classic following the termination of his employment. In other words, Snyder claims essentially that once he resigned, he became free to enjoy the fruits of his breach of fiduciary duties. Snyder cites no relevant authority in support of this assertion.

In a related context, we have held that termination of a fiduciary relationship does not shield the fiduciary from its duties or obligations concerning "transactions that have their inception before the termination of the relationship." *Abdalla v. Qadorh-Zidan*, 913 N.E.2d 280, 286 (Ind. Ct. App. 2009) (quoting *Thompson v. Ctr. Ohio Cellular, Inc.*, 639 N.E.2d 462, 469 (Ohio Ct. App. 1994)), *trans. denied. See also Standage v. Planned Inv. Corp.*, 772 P.2d 1140, 1144 (Ariz. Ct. App. 1988) ("where a transaction has its inception while the

---

[4] We explained in part in *SJS Refractory*:

> An employee owes his employer a fiduciary duty of loyalty. To that end, an employee who plans to leave his current job and go into competition with his current employer must walk a fine line. Prior to his termination, an employee must refrain from actively and directly competing with his employer for customers and employees and must continue to exert his best efforts on behalf of his employer…. These rules balance the concern for the integrity of the employment relationship against the privilege of employees to prepare to compete against their employers without fear of breaching their fiduciary duty of loyalty.

*Id*. at 768 (citations omitted).

9

fiduciary relationship is in existence, an employee cannot by resigning and not disclosing all he knows about the negotiations, subsequently continue and consummate the transaction in a manner in violation of his fiduciary duties") (quoting *Microbiological Research Corp. v. Muna*, 625 P.2d 690, 695 (Utah 1981)); *Duane Jones Co. v. Burke*, 117 N.E.2d 237, 245-46 (N.Y. 1954) ("[n]or is it a defense that the defendants-appellants did not avail themselves of the benefit of the customers…diverted from plaintiff until after defendants [had left employment]"; the benefits realized by defendants' new company were "merely the results of a predetermined course of action" and earlier breach of fiduciary duty).  Although Snyder's fiduciary relationship with Classic terminated when the employment relationship ended, he may not capitalize on opportunities (i.e., customers) that he usurped or transactions that had their inception before the termination of the fiduciary relationship.

Snyder has failed to establish that the trial court abused its discretion in determining that Classic had a reasonable likelihood of success at trial on its tortious interference claim. Moreover, Snyder's claim that a preliminary injunction is improper because he no longer owes a fiduciary duty to Classic is entirely unsupported and without merit.  We affirm the preliminary injunction issued by the trial court on this ground.

2.

Snyder also contends that the trial court abused its discretion when it determined that Classic's trade-secret claims had a reasonable likelihood of success at trial.  In this regard, Snyder's sole argument is that the materials he undeniably misappropriated – Classic's customer list, correspondence from one of Classic's largest customers, and a pricing list for

10

this customer – do not qualify as trade secrets.

The Indiana Uniform Trade Secrets Act provides that either actual or threatened misappropriation of trade secrets may be enjoined. Ind. Code Ann. § 24-2-3-3(a) (West, Westlaw current through 2012 2nd Reg. Sess.). The Act defines the term trade secret as "information, including a…compilation" that:

> (1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

I.C. § 24-2-3-2 (West, Westlaw current through 2012 2nd Reg. Sess.). "The determination of whether information is a trade secret is a fact sensitive determination." *U.S. Land Servs., Inc. v. U.S. Surveyor, Inc.*, 826 N.E.2d 49, 63 (Ind. Ct. App. 2005).

Although there appears to be at least some merit to Classic's trade secret claims, we need not address the likelihood of success at trial on this claim. The trial court cited dual bases for the issuance of the preliminary injunction in this case. Because we have upheld the preliminary injunction on the basis of the tortious interference claim, we may end our inquiry without delving into the law of trade secrets.

Judgment affirmed.

NAJAM, J., and BRADFORD, J., concur.

11